Brian W. LaCorte (012237)
LaCorteB@ballardspahr.com
Jonathon A. Talcott (030155)
TalcottJ@ballardspahr.com
Mitchell Turbenson (033278)
TurbensonM@ballardspahr.com
**BALLARD SPAHR LLP**
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Tel: 602.798.5400
Fax: 602.798.5595

Brett M. Schuman (*pro hac vice*)
BSchuman@goodwinlaw.com
Jeremy N. Lateiner (*pro hac vice*)
JLateiner@goodwinlaw.com
Nicholas M. Costanza (*pro hac vice*)
NCostanza@goodwinlaw.com
**GOODWIN PROCTER LLP**
Three Embarcadero Center
San Francisco, CA 94111
Tel: 415.733.6000
Fax: 415.677.9041

*Attorneys for Defendant and Counterclaimant*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

BBK Tobacco & Foods, LLP, an Arizona limited liability partnership, d/b/a HBI International,

Plaintiff,

v.

Central Coast Agriculture, Inc., a Delaware corporation,

Defendant.

---

Central Coast Agriculture, Inc., a Delaware corporation,

Counterclaimant,

v.

BBK Tobacco & Foods, LLP, an Arizona limited liability partnership, d/b/a HBI International,

Counterdefendant.

Case No. CV-19-05216-PHX-MTL

**CCA'S MOTION TO EXCLUDE THE TESTIMONY OF BBK'S EXPERT DR. ON AMIR**

Judge: Hon. Michael T. Liburdi

**ORAL ARGUMENT REQUESTED**

# I. INTRODUCTION.

In this case, Plaintiff and Counterdefendant BBK Tobacco & Foods LLP ("BBK") asserts primarily claims for trademark infringement against Defendant and Counterclaimant Central Coast Agriculture, Inc. ("CCA"). Under the applicable test for assessing BBK's trademark infringement claims, one of the factors to be considered is the "degree of care likely to be exercised by the purchaser[.]" *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

On this factor, BBK is proposing to introduce opinion testimony from Dr. On Amir, a University of California at San Diego marketing professor with no expertise or even experience with the cannabis industry or cannabis consumers. Dr. Amir proposes to offer the opinion that cannabis consumers exercise a <u>low</u> degree of care in making purchasing decisions. (Ex. 1).

The Court should exercise its gatekeeping role under *Daubert* to exclude Dr. Amir's proposed opinion testimony on at least the following grounds:

*First*, Dr. Amir does not qualify as an expert on this issue. He admits he is "not an expert on cannabis." (Ex. 3 at 56:5-9, 57:8-14 ("I don't have work experience that has to do with cannabis."), 85:17-86:1, 87:14-19). Further, Dr. Amir didn't do ***any*** scientific research after he was retained, either through conducting a survey or investigating the cannabis market. (*Id.* at 33:1-16, 91:6-92:19).

*Second*, Dr. Amir's opinions are not based on any science or methodology whatsoever. In discovery, CCA produced presentations that a market research company named MFour had prepared for CCA in 2019 and 2020 after MFour had conducted a survey on a quarterly basis for CCA (hereinafter, the "2019-2020 MFour Survey Summary Presentations" and the "2019-2020 MFour Surveys"). It is undisputed that the 2019-2020 MFour Surveys were completely unrelated to this litigation, with the basic goal of [redacted] (Ex. 4 at 2; Ex. 5 at 3). In other words, the 2019-2020 MFour Surveys were ***not*** designed

to determine the degree of care exercised by consumers of CCA's products.[1] (Ex. 3 at 100:6-22). Nevertheless, according to his expert report, Dr. Amir did not perform his own survey and instead based his opinion exclusively on (1) the 2019-2020 MFour Survey Summary Presentations; and (2) Dr. Amir's personal observations of customers at a few cannabis dispensaries that he visited on August 7, 2021. (Ex. 1 at 1 ("The evidence provided in the five mfour reports and my observations of the purchasing process at dispensaries is evidence consistent with low involvement purchasing behavior consistent with low degree of consumer care.")).

With respect to (1), Dr. Amir simply cherry-picked certain responses from the 2019-2020 MFour Survey Summary Presentations that, again, were not designed or intended to determine the degree of care of exercised by CCA's customers when they purchase CCA products. Indeed, Dr. Amir admits that if he had designed a survey to determine the degree of care exercised by CCA's customers when they purchase CCA products, "***the entire structure [methodology] and design would have been different []***" from the 2019-2020 MFour Surveys that form the basis for his opinion. (Ex. 3 100:23-101:15 (emphasis added)). Consequently, Dr. Amir's use of these MFour Summary Presentations "is unduly results-driven, not good science, and therefore inadmissible." *See In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1039 (S.D. Cal. 2021).

With respect to (2), at his deposition, Dr. Amir expressly disclaimed any reliance on his dispensary visits as support for his opinion. (*See, e.g.*, Ex. 3 at 182:3-20 ("I don't view [my dispensary visits] as scientific research. And my opinion is not based on th[o]se

[1] With regard to MFour, the Court should note that there are two MFour surveys that are at issue in this litigation. As the Court may recall from a recent discovery dispute, after Dr. Amir served his opening report, CCA retained MFour to conduct a ***new and different*** survey – 2021 MFour Rebuttal Survey – that ***was*** related to this litigation and specifically intended to measure (1) the level of care exercised by consumers of cannabis concentrates in California, and (2) likelihood of confusion. Doc. 286 at 1. The 2021 MFour Rebuttal Survey did not exist when Dr. Amir submitted his opening report. CCA's rebuttal expert, Dr. Elisabeth Honka, addressed the degree of care portion of the 2021 MFour Survey in her rebuttal report, shortly after the survey was completed. In a reply report, Dr. Amir also commented on the 2021 MFour Survey, both with regards to consumer degree of care and likelihood of confusion. The 2021 MFour Survey, which ***is*** reliable under *Daubert*, is not at issue in this motion except to the extent Dr. Amir improperly addressed the likelihood of confusion portion in his reply report. *See* Section III.D, *infra*.

visits.")). Therefore, extensive briefing should not be required for the Court to issue an Order precluding Dr. Amir from testifying about what he saw or overheard during those visits, which were the first times he ever stepped foot in a cannabis dispensary. (*Id.* at 84:14-23).

*Third*, Dr. Amir submitted a reply report containing some opinions that go beyond the issues addressed in his opening report and the CCA rebuttal to that report. In his reply report (Ex. 2), Dr. Amir purports to address likelihood of confusion issues that are also addressed both in opening and reply reports by another of BBK's retained experts, Dr. Jeffrey Stec. This portion of Dr. Amir's reply report should be excluded under the provision of the Court's scheduling order that states: "Each side shall be limited to one retained or specifically employed expert witness per issue." Doc. 31 at 4. *See also* Fed. R. Evid. 403 ("[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of… needlessly presenting cumulative evidence.").

## II. <u>STATEMENT OF RELEVANT FACTS.</u>

Dr. Amir is a marketing professor at the University of California at San Diego. (Ex. 1 at 9). He was retained by BBK on June 13, 2021 to provide an expert opinion in this case "as to the degree of care likely to be exercised by purchasers of cannabis products in California and, in particular, the purchasers of the cannabis products offered for sale under the Raw Garden trademark by CCA." (Ex. 1 at 1; Ex. 3 at 12:2-4). Yet, Dr. Amir has no expertise in cannabis and he did not do ***any*** independent research into the cannabis market, either. (Ex. 3 at 33:1-16, 56:5-9, 57:8-14, 85:17-86:1, 87:14-19, 91:6-92:19). Dr. Amir has also never published any papers having to do with cannabis consumers or their purchasing habits. (*Id.* at 85:17-21).

In 2019, unrelated to this litigation, CCA retained a market research company named MFour to perform a survey for CCA. (Ex. 5 at 3). [redacted]

[redacted] (Ex. 3. at 106:1-9; Ex. 4 at 2). Following each wave of the survey, MFour prepared a summary presentation and sent it to CCA. (*See, e.g.*, Ex. 4; Ex. 5; Ex. 1 at 2).

MFour did not provide CCA with the survey questionnaires (also known as the survey instrument) or any of the raw data it collected from these quarterly surveys. As such, CCA was only able to produce the five summary presentations to BBK in discovery. (Ex. 1 at 2). Despite its intent to have Dr. Amir use those summary presentations as the basis for an expert opinion (as opposed to him conducting his own survey), BBK did not subpoena the survey questionnaire or the raw data from the responses from MFour in discovery.[2]

Upon retaining Dr. Amir, BBK's counsel provided him with the 2019-2020 MFour Survey Summary Presentations and asked him to provide an opinion about the degree of care exercised by CCA customers *based solely on those presentations*. (Ex. 3 at 90:9-92:16). BBK never asked Dr. Amir to perform his own survey. (*Id.*) And Dr. Amir admits that if he had designed and performed his own survey, "it would be a totally different methodology" and "the entire structure and design would have been different." (*Id.* at 100:23-101:15).

In forming his opinion, Dr. Amir's so-called "methodology" was simply to find evidence in the 2019-2020 MFour Survey Summary Presentations about whether CCA's products are "high involvement" products, which may be associated with a high degree of care, or "low involvement" products, which may be associated with a low degree of care. (Ex. 3 at 90:9-92:16; Ex. 1 at 3).

Besides reviewing the 2019-2020 MFour Survey Summary Presentations, Dr. Amir

---

[2] At his deposition, Dr. Amir recalled telling BBK's counsel after he was retained that "it's always better to have the original raw data" because "when we look at the [MFour] reports, we are relying on someone else's analysis of the data, and it's only as good as their analysis, and I always like to double-check." (*See* Ex. 3 at 45:18-46:9; *id.* at 111:17-112:12 ("we can only speculate on … how bad or good [the 2019-2020 MFour Surveys'] design is. And I think I said before, without having the survey instrument, I'm not going to make definitive comments about the survey.")).

also visited five cannabis dispensaries near his home in San Diego on August 7, 2021, a few days before the report was due. (Ex. 1 at 3). Dr. Amir's opening report includes an appendix that contains information about the dispensaries he visited and a summary of his observations. (Ex. 1 at Appx. B). He also includes some of his observations in the narrative portion of his report, including quoting or paraphrasing information he learned from eavesdropping on customers, some of whom may have been purchasing cannabis for medicinal purposes based on a physician's recommendation. (*Id.* at 7; Ex. 3 at 176:20-25, 183:7-184:7). Dr. Amir then states in his opening report that he conducted "qualitative research" at the dispensaries and that his "observations [at the dispensaries] are consistent with the … data presented across the five mfour reports." (Ex. 1 at 3, 6-7).

On September 10, 2021, CCA produced a report from Dr. Elisabeth Honka, a marketing professor at UCLA, responding to Dr. Amir's opening report. Ex. 6 at 1).

On October 8, 2021, Dr. Amir submitted another report, which he titled "rebuttal report" but is actually a reply report. In this reply report, Dr. Amir responded to Dr. Honka's criticisms of his opinion and, in doing so, revisits and restates many of his opinions from his opening report. (*See generally* Ex. 2). Also in his reply report, Dr. Amir address both the consumer degree of care *and the likelihood of confusion* portion of a rebuttal survey that was conducted in September 2021 by MFour for CCA for purposes of this litigation (the "2021 MFour Rebuttal Survey"). (*Id.* at 7). Another BBK expert, Dr. Stec, also addresses the likelihood of confusion portion of the 2021 MFour Rebuttal Survey in his reply report. (Ex. 7 at 13-35).

## III. **ARGUMENT.**

Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." A trial court acts as a "gatekeeper" to the admission of expert testimony and must ensure unreliable expert testimony does not reach the jury. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

Before a witness may come "before the jury cloaked with the mantle of an expert[ ]" under Rule 702, the Ninth Circuit has cautioned that "care must be taken to assure that a proffered witness truly qualifies as an expert, and that such testimony meets the requirements of [that] Rule[.]" *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001). Thus, as a threshold matter, the Court must determine whether the witness is "qualified as an expert by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*").

Once a court makes the "preliminary" determination that a witness qualifies as an expert (*see* Fed. R. Evid. 104(a)), the focus shifts to that witness's proffered testimony. The Ninth Circuit has articulated a two-prong analysis. First, the proffered testimony must be reliable. The expert's testimony must be based on scientific knowledge and demonstrate that the findings are derived by the scientific method, and that the work product amounts to "good science." *Daubert II*, 43 F.3d at 1315 (citation and quotation marks omitted). Second, the testimony must meet the "fit" requirement. It must "logically advance[] a material aspect of the proposing party's case." *Id.* (citation and quotation marks omitted).

In determining reliability, the focus is on the expert's "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95. The proponent of an expert is required to show that the witness's testimony is based on something "more than subjective belief or unsupported speculation." *Id.* at 590. "[T]he court's 'task . . . is to analyze not what the experts say, but what basis they have for saying it.'" *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting *Daubert II*, at 1316 ).

Fitness of expert testimony is directed "primarily to relevance." *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (citation omitted). Beyond relevance, this inquiry recognizes that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Id.* at 595. "Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over

experts than over lay witnesses." *Id.* (citation omitted).

**A. Dr. Amir Is Not Qualified to Offer Any Opinion on the Degree of Care Exercised by the Ordinary Consumer of CCA Cannabis Products.**

Under the sixth *Sleekcraft* factor, "the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 634 (9th Cir. 2005) (citation omitted). In a forward confusion case such as this, the focus is on the degree of care exercised by consumers of the <u>defendant's (here, CCA's) products</u>. Doc. 241 at 16-17 (noting that this is a "forward confusion" case); *Rise Basketball Skill Development, LLC v. K Mart Corporation*, No. 16-cv-04895-WHO, 2017 WL 4865561, at *6 (N.D. Cal., Oct. 27, 2017).

But, as discussed above, Dr. Amir admits that he is not an expert in any topic relating to cannabis. (Ex. 3 at 56:5-9, 57:8-14, 85:22-86:1, 87:14-19). Dr. Amir has never studied or published any papers having to do with cannabis consumers or their purchasing habits. (*Id.* at 85:17-21). And, even after he was retained to provide an expert opinion in this case about cannabis purchasing habits, Dr. Amir *still* did not do *any* independent research about cannabis consumers, either in general or for the specific types of products made by CCA, besides reviewing the summary presentations provided to him by BBK and visiting a few dispensaries. (*Id.* at 33:1-16, 91:6-92:19; *compare* Ex. 6 at 4-8).

The fact that Dr. Amir is a marketing professor and has expertise in consumer behavior in general does not give him *carte blanche* to offer expert opinions about consumers and products that he has never independently studied, either for purposes of this litigation or otherwise. *See Hirata v. Southern Nevada Health District*, No. 2:13-CV-2302-LDG-VCF, 2016 WL 10706085, at *3 (D. Nev., May 31, 2016) ("An expert's general expertise in a subject area … will not automatically qualify the expert to testify on a specific sub-category within that subject area."). Given Dr. Amir's lack of expertise as to cannabis products, including the types of products sold by CCA, his testimony should be excluded. Fed. R. Evid. 702(a).

### B. Dr. Amir's Opinions about the 2019-2020 MFour Survey Summary Presentations Should Be Excluded Because They Are Not Based on Any Good Science or Methodology.

To be sure, one way to determine the degree of care is to look at whether the product at issue is a high involvement product or a low involvement product. *See Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1028 (N.D. Cal. 2017). In *Sazerac*, a trademark infringement case brought by a bourbon distiller against a premium wine seller, the defendant wine seller retained a marketing professor to offer an opinion about whether the defendant's product was high or low involvement product. The court summarized the professor's opinion as follows:

> "[A] decision to purchase wine typically belongs to the type of buying decisions known in the consumer behavior literature as 'high involvement decisions' " or "a decision that requires a great degree of care." [Defendant] markets as a premium wine. It typically retails at grocery or liquor stores from $16.99 to $18.99. This is to maintain the wine at a "premium" price point, which is typically anything over $15 per bottle. Approximately 5 percent of all wine sold in the U.S. sells for more than $14 per bottle. Further, red zinfandel is a niche varietal, representing approximately 1.5 percent of the total wine market. Wine consumers purchasing from this small category of wines exhibit a high degree of care given that such wine is a "double niche"—both in terms of price and varietal; such purchases are "high involvement" decisions, according to [defendant's expert].

*Id.* at 1028 (citations omitted).

The Court went on to agree with the defendant's expert, and found the defendant's wine was a high involvement product:

> The "reasonably prudent consumer" is expected "to be more discerning—and less easily confused—when he is purchasing expensive items." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999). Purchasers of premium alcoholic beverages tend to exercise a high degree of sophistication and care when making their purchasing decisions. *See Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 390 (2d Cir. 2005) ("Unhurried consumers in the relaxed environment of the liquor store, making decisions about $12 to $24 purchases, may be expected to exhibit sufficient sophistication to distinguish between Star's and Bacardi's products, which are differently labeled."). This is especially true considering that 1000 Stories is a "double niche" wine product—existing at a price point ($14.00 and above) that is merely 5 percent of the total wine market, and a varietal (red

> zinfandel) that is only 1.5 percent of the market. Purchasers of a premium red zinfandel, therefore, are expected to exercise a high degree of care and are less likely to make mistakes as to product original, sponsorship, or affiliation. This factor [degree of care] supports [defendant].

*Id.* at 1037-38.

Here, Dr. Amir purports to opine that cannabis generally is a low involvement product and, therefore, the ordinary cannabis consumer exercises a low degree of case. However, Dr. Amir did not conduct any of the analysis that the expert did in *Sazerac*. For example, Dr. Amir did not investigate the price of CCA's cannabis products relative to other types of cannabis products. (Ex. 3 at 162:19-163:12). Dr. Amir also failed to investigate whether any of the types of products sold by CCA (e.g., cannabis concentrates) are niche products.[3] In fact, as discussed above, Dr. Amir did no research or investigation at all. He simply reviewed the 2019-2020 MFour Survey Summary Presentations provided to him by BBK's counsel and then cherry-picked certain data from those documents that supposedly support an opinion that CCA's products are low involvement products while completely ignoring other data in those documents that show cannabis products are high involvement products.

Dr. Amir also failed to consider the proper consumers and products. In assessing degree of care, courts focus on the relevant type of product within a category, not the general category. For example, the *Sazerac* court focused on "[p]urchasers of a premium red zinfandel" as opposed to wine in general. 265 F. Supp. 3d at 1038. Although CCA only sells cannabis concentrates and vape oils (Ex. 6 at 8), [redacted] (Ex. 5 at 3). Although some of the information that Dr. Amir relied on was limited to CCA customers (*id.* at 15, 20), other information was not, and yet Dr. Amir nevertheless relied on it to support his opinion. (*Id.* at 13-14).

In short, Dr. Amir's opinion is not based on any good science, and therefore his

[3] There is substantial evidence, completely ignored by Dr. Amir, that CCA's products are niche cannabis products. (Ex. 6 at 6-13).

testimony should be excluded. *See Incretin-Based Therapies*, 524 F. Supp. 3d at 1039; *Allen v. Am. Cap. Ltd.*, 287 F. Supp. 3d 763, 786, 788 (D. Ariz. 2017). Specifically, Dr. Amir's opinion that the 2019-2020 MFour Survey Summary Presentations establish that cannabis customers exercise a <u>low</u> degree of care in making purchasing decisions is premised on five "observations" (or sub-opinions) set forth in his opening report. (Ex. 1 at 5-6). Each of those sub-opinions fail for the reasons discussed below.

**1. Dr. Amir's Opinion that the 2019-2020 MFour Survey Summary Presentations Show that Consumers Place a Relatively Low Importance on Objective Product Attributes Is Unsupported.**

According to the 2019-2020 MFour Survey Summary Presentations, question #31 in the 2019-2020 MFour Survey was: "How important are the following factors in influencing your decision to buy a Cannabis product/brand?" (Ex. 5 at 14; Ex. 4 at 18). [redacted]

| [redacted] | [redacted] | [redacted] |
| --- | --- | --- |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

(Ex. 5 at 14).

[redacted]

(Ex. 4 at 18).

Based on the foregoing chart, Dr. Amir wrote in his report:

> In the responses [to question #31], the respondents repeatedly identify product price as one of the top 3, at 87-90%, important attributes affecting their purchase decisions. In contrast, the majority of objective attributes (like the manner in which ingredients are extracted, or the origin location of the source plant) top out at the low to high 70's. This pattern and the importance of price are usually characteristic of low involvement commodity purchasing. Therefore, this information in the mfour reports suggests that purchasers of cannabis products, like those sold using the Raw Garden name, are likely to place a lesser importance on objective attributes (like the manner in which ingredients are extracted, or the origin location of the source plant) while deciding which brand of cannabis product to purchase.

(Ex. 1 at 5).

Dr. Amir has no scientific support for his opinion based on the presentation slides relating to question #31:

*First*, question #31 was not limited to the relevant survey universe, i.e., consumers of cannabis concentrate and/or vape oils products. As such, the responses are not relevant.

*Second*, Dr. Amir cites no support in his report for his decision to only consider the "top 3" responses, and he was also unable to identify any such support during his deposition. (Ex. 3 at 150:7-152:12. In arbitrarily limiting his analysis to the "top 3," Dr. Amir completely wrote off the fact that over 50% of survey takers also find other factors to be somewhat important or very important.

*Third*, Dr. Amir's decision not to address the top two responses – "[h]igh quality" and "[p]otency" – at all in his report is dispositive evidence of his improper cherry-picking and results-oriented approach to forming his opinion. Customers prioritizing high quality products over lower-quality products are generally higher involvement consumers who exercise a high degree of care. (Ex. 6 at 5-7). [redacted] (Ex. 3

at 131:16-132:1, 144:11-147:3). [redacted], Dr. Amir ignored that response all together in his report. At his deposition, Dr. Amir had no scientific basis [redacted] (Ex. 3 at 165:1-5).

**2. Dr. Amir's Opinion that the 2019-2020 MFour Survey Summary Presentations Show that Consumers Make Impromptu or Impulse Purchases at Dispensaries Is Unsupported.**

Question #33 in the 2019-2020 MFour Survey was: "How far in advance do you decide what you're going to buy?" product/brand?" (Ex. 5 at 12; Ex. 4 at 19). [redacted]

[redacted]

(Ex. 4 at 19). Dr. Amir stated in his report: "The high rate of same-day and in-store purchase decisions [reflected in the responses to question #33] strongly signal that cannabis products, including those carrying the at-issue Raw Garden mark, may be acquired through impromptu or impulse purchases." (Ex. 1 at 6).

Again, the responses to question #33 are <u>not</u> limited to consumers of CCA's cannabis concentrate and/or vape oils products. Moreover, Dr. Amir has no methodology or other support for reaching conclusions about impromptu or impulse purchases based on question

[4] Again, the only time Dr. Amir has *ever* been to a cannabis dispensary is on August 7, 2021, when he went to a few dispensaries near his home for purposes of this case. (Ex. 3 at 84:20-23).

#33. Question #33 doesn't ask about impromptu or impulse purchases, nor did any other questions that are reflected in the summary presentations. (Ex. 3 at 155:4-12). And, Dr. Amir concedes that someone who "decide[d] in the store" wasn't necessarily making an impromptu or impulse purchase. (*Id.* at 156:3-7). Someone could have researched the products that they were interested in before entering the dispensary, and then made a final purchasing decision at the dispensary after having spent time in the dispensary reviewing product labels, talking to the budtender, etc. Dr. Amir's concession highlights the essential problem with his attempt to find support for his opinion in summaries of surveys that indisputably were not designed or intended to measure the degree of care exercised by any cannabis consumer.

**3. Dr. Amir's Opinion that CCA's Products Are in a Relatively Low Price Range Is Not Helpful for the Trier of Fact or Based on Sufficient Data.**

Question #34 in the 2019-2020 MFour Survey was: "How much do you typically spend on the below Cannabis products in a given trip to the dispensary?" (Ex. 5 at 15-16; Ex. 4 at 22-23). The presentations show the following results:

[redacted]

(Ex. 4 at 22-23).

Based on these slides in the presentations, Dr. Amir stated in his report that "the majority of the responders … indicated that the majority of their purchases fall in a fairly low spend-range ($21-60) – the amount spent per visit, which could include one or more products" and this "suggests that purchases of cannabis products, like those sold using the Raw Garden name, are likely to involve purchases of low or lower price products for which

some consumers' purchasing decisions involve low involvement." (Ex. 1 at 6).

Dr. Amir's reliance on the 2019-2020 MFour Survey Summary Presentations to determine the price level of CCA's products is absurd, and further demonstrates his results-driven approach. He could have very easily determined the prices of CCA's products, and other cannabis products, on the internet or by visiting dispensaries, but he did not. (Ex. 3 at 162:19-163:12). Had he bothered to check, as Dr. Honka did, he would have found that CCA's cannabis concentrate products are relatively expensive: $35.56 for 1 gram. (Ex. 6 at 18). So are its vape cartridge products: $31.75 for .5 grams. (*Id.*). Instead, Dr. Amir relied exclusively on the data in the 2019-2020 MFour Survey Summary Presentations that do not show what any particular CCA product, or other cannabis product, costs.

Further, the surveys asked only about "amount spent per visit, which could include one or more products." (Ex. 1 at 6). Thus, the fact that someone said, for example, they spend $41-60 per dispensary visit on cannabis vape oil products, means the person could be buying three products for $20 each, two products for $30 each or one product for $60 each. And it could be that none of those products are CCA products. Given that the specific prices of CCA's products, and other products, are readily available, the information in the summary presentations about how much consumers generally spend at dispensaries is plainly not helpful to the trier of fact.

**4. The Limited Information In The 2019-2020 MFour Survey Summary Presentations about Open-Ended Responses from Survey Respondents Cannot Support an Expert Opinion.**

Question #36a in the 2019-2020 MFour Surveys asked respondents who indicated that they purchased CCA products in the past year to state the "primary reasons" they had bought CCA products. (Ex. 5 at 20; Ex. 4 at 26). This was an "open-ended" question, meaning respondents could type in a response. [redacted]

[redacted] *Id.* Based on the limited information in the presentation relating to question #36a, Dr. Amir concludes that "for consumers of cannabis products, like the Raw Garden products, the product price and product promotions play a major role in their purchasing decisions for these products. Such factors are consistent with low involvement purchasing decisions." (Ex. 1 at 6).

But, Dr. Amir has not seen all the responses to question #36a, nor does he know whether there are any other categories that MFour coded, but didn't include in the presentations. Dr. Amir admits so much in his report, stating: "I do not have access to the underlying raw data, and focus on the main takeaways from the analyses as presented by the market research company." (*Id.*). Further, Dr. Amir admitted at his deposition that he has "no idea" what methodology MFour used to code the responses, or whether any responses were coded as more than one category. (Ex. 3 at 167:2-168:24).

Dr. Amir's decision to rely on the slides relating to question #36a again highlights his unscientific and results-driven approach. He has no scientific methodology whatsoever to support this sub-opinion about question #36a – he is simply cherry-picking statements that he believes support his opinion even though he admittedly doesn't know if he is relying on complete or accurate information. This presents a prototypical example of when a court should exercise its gatekeeping function.[5]

### C. Dr. Amir's Testimony about His Visits to Cannabis Dispensaries Should Be Excluded Based They Are Not Based on Any Science or Methodology Whatsoever.

As discussed above, Dr. Amir appeared to state in his reports (both his opening report and his reply report) that his opinion that cannabis consumers exercise a low degree of care in making purchasing decisions is based in part on his personal observations of customers

[5] Dr. Amir has one additional sub-opinion in his report, *i.e.*, that the 2019-2020 MFour Surveys are biased towards high involvement because they are only available on mobile apps. (Ex. 1 at 5). This (unsupported) sub-opinion would only be relevant if the 2019-2020 MFour Presentations otherwise supported an opinion about the degree of care exercised by CCA's customers. For the reasons discussed in Section III.B of this brief, it does not.

at a few cannabis dispensaries near his home in Southern California on August 7, 2021. (Ex. 1 at 3, 6, 7; Ex. 2 at 9]. At his deposition, however, Dr. Amir completely and repeatedly disclaimed his observations from these dispensary visits as a basis for his opinion regarding the degree of care exercised by ordinary cannabis consumers. (Ex. 3 at 174:4-5 ("I'm not actually basing my opinion on [observations at the dispensaries]"); *id.* at 173:14-175:19, 178:3-10, 182:3-20, 214:20-215:7).

Dr. Amir testified at his deposition that he visited the dispensaries because he is not a consumer of cannabis products and he "wanted to make sure that [he was] reading the [MFour] reports and the terms [in the reports] correctly." (Ex. 3 at 38:23-39:13, 84:13-23 ("I ha[d] not been in a cannabis dispensary before being retained in this case, which is why I decided to go to cannabis dispensaries.")).

Given Dr. Amir's concessions at his deposition that his dispensary visits were not "scientific research," and that he did not base his opinion on those visits, Dr. Amir should be precluded from testifying about the visits at trial. Such testimony is not based on a reliable methodology, is not relevant and is unduly prejudicial. *See* Fed. R. Evid. 703.

**D. Dr. Amir's Opinions about Likelihood of Confusion in His Reply Report Should Be Excluded.**

BBK disclosed Dr. Amir as an expert who "will testify on issues related to the degree of care exercised by consumers of cannabis products in California, including consumers of Defendant's cannabis products offered under the Raw Garden mark." (Ex. 8 at 1). In his opening report, Dr. Amir expressed his opinion on that topic and no other topic. (*See generally* Ex. 1). BBK disclosed another expert, Dr. Stec, who "will testify on issues related to … the likelihood of confusion between Plaintiff's goods sold or offered for sale in connection with Plaintiff's RAW trademarks and Defendant's goods sold or offered for sale in connection with Defendant's Raw Garden trademark." (Ex. 8 at 1).

In connection with its rebuttal reports, CCA conducted and disclosed a rebuttal survey conducted for it for purposes of this litigation by MFour. The 2021 MFour Survey addressed two issues: (1) consumer degree of care, and (2) likelihood of confusion. Doc.

286 at 1.

BBK's experts, Dr. Amir and Dr. Stec, both served reply reports purporting to respond to the likelihood of confusion portion of the 2021 MFour Survey. (Ex. 2 at 7; Ex. 7 at 13-35).

The Court's scheduling order states: "Each side shall be limited to one retained or specifically employed expert witness per issue." Doc. 31 at 4. CCA complied with that Order, but BBK did not. *See also United States v. Alisal Water Corp.*, 431 F.3d 643, 659–660 (9th Cir. 2005) (affirming exclusion of cumulative expert witness testimony). Therefore, Dr. Amir's testimony about the likelihood of confusion portion of the 2021 MFour Survey should be excluded.

## IV. <u>CONCLUSION</u>.

Based on the foregoing, CCA respectfully requests an Order precluding Dr. Amir from offering any expert opinion testimony at trial.

By: /s/ *Brian W. LaCorte*
BRIAN W. LaCORTE (ABN 012237)
*LaCorteB@ballardspahr.com*
JONATHON A. TALCOTT (ABN 030155)
TalcottJ@ballardspahr.com
MITCHELL TURBENSON (ABN 033278)
*TurbensonM@ballardspahr.com*
**BALLARD SPAHR LLP**
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Tel 602.798.5400
Fax 602.798.5595

BRETT M. SCHUMAN (SBN 189247)
*BSchuman@goodwinlaw.com*
JEREMY N. LATEINER (SBN 238472)
*JLateiner@goodwinlaw.com*
NICHOLAS M. COSTANZA (SBN 306749)
*NCostanza@goodwinlaw.com*
**GOODWIN PROCTER LLP**
Three Embarcadero Center
San Francisco, California 94111
Tel.: 415.733.6000
Fax: 415.677.9041

Attorneys for Defendant and Counterclaimant
CENTRAL COAST AGRICULTURE, INC.

**Table of Exhibits**

| Exhibit Number | Description |
|---|---|
| Ex. 1 | Dr. On Amir's August 13, 2021 Opening Report |
| Ex. 2 | Dr. On Amir's October 6, 2021 Reply Report |
| Ex. 3 | Transcript of October 27, 2021 Deposition of Dr. On Amir |
| Ex. 4 | CCA001870 – CCA001907 |
| Ex. 5 | CCA001033 |
| Ex. 6 | Dr. Elisabeth Honka's September 10, 2021 Rebuttal Report |
| Ex. 7 | Dr. Jeffery A. Stec's October 8, 2021 Reply Report |
| Ex. 8 | Plaintiff's August 13, 2021 Disclosure of Expert Testimony |