**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| BBK Tobacco & Foods LLP, | No. CV-19-05216-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| Central Coast Agriculture Incorporated, et al., | |
| Defendants. | |

This action involves a trademark dispute between Plaintiff BBK Tobacco & Foods, LLP ("BBK") and Defendant Central Coast Agriculture Incorporated ("CCA"). Before the Court are numerous motions filed by the parties, including cross motions for summary judgment (Docs. 203, 218, 293), and motions to exclude expert testimony (Docs. 298, 302, 304, 305, 306, 307, 308, 311, 314, 317, 433). The motions are fully briefed, oral argument was held on June 16, 2022. (Doc. 416.) The Court rules as follows.

## I.    BACKGROUND

BBK manufactures, distributes, and sells smoking-related products bearing its trademarked "RAW" branding.[1] BBK's RAW branded products include cigarette rolling papers; smoking accessories; merchandise such as hats, t-shirts, and hoodies; and information services regarding these and other products.[2] BBK has sold RAW branded

---

[1]    BBK's marks include: "RAW," "RAW ORGANIC," "RAW ARTESANO," "SUPERNATURAL RAW," "RAW CONNOISSEUR," and "RAW BLACK."

[2] BBK maintains multiple internet domains incorporating the RAW designation, including www.rawthentic.com, www.rawsmoke.com, and www.rawfoundation.com. It also uses the Instagram handles @rawkandroll and @rawlife247.com and the Facebook page entitled "RAW Rolling Paper."

products for almost two decades and such products are now sold in retail locations in all 50 states.

CCA's predecessors were formed around 2008, when Thomas Martin and Khalid Al-Naser began growing and trading cannabis with cannabis patients under California's Compassionate Use Act. In 2012, Martin developed a process for using carbon dioxide to extract cannabis-infused oil to use in making medical cannabis concentrates. At that time, most cannabis concentrate brands were using a high-heat extraction process that "cooked" their concentrates. Thus, Martin's process, by comparison, yielded "raw" concentrate. In late 2013, Martin and Al-Naser began delivering packaged, finished cannabis concentrates branded "RawCo2" to collectives.[3] Shortly thereafter, Al-Naser's nonprofit, GSS, began selling RawCo2 to California dispensaries. GSS also sold concentrate products branded "Raw Hashish," "RawSin," and "Raw Gold." In 2014, Martin and Al-Naser, along with some third-party dispensaries, began marketing their concentrate products on social media. Then, in or around November 2014, Martin began using the term "Raw Gardener" to delineate his products and he and Al-Naser began referring to their social media followers as the "RawTribe."

Approximately two years later, around October 2016, CCA was formed and acquired GSS's assets, including the rights to the RawCo2, Raw Hashish, RawSin, and Raw Gold brands.[4] Upon CCA's formation, Martin transitioned from using "Raw Gardener" to "Raw Garden" to identify his products. In March 2016, CCA sold its first Raw Garden branded concentrate products.[5] CCA now markets and sells its cannabis products exclusively under the Raw Garden brand and exclusively through California-licensed dispensaries and mobile delivery services.

BBK and CCA (or its predecessors) have in the past attended many of the same

---

[3] BBK asserts that RawCo2 was an extraction process, not a product. (*See* Doc. 246 at 8 n.2; Doc. 229-5).

[4] BBK claims that CCA did not acquire GSS's assets and accordingly is not a legal successor to GSS. (Doc. 246 at 8; Doc. 229-3 at 3.)

[5] BBK again objects to CCA's assertion. It contends that, prior to 2018, CCA provided only "consulting services" to a few collectives. (Doc. 246 at 9.) The undisputed evidence, however, supports CCA's position. (Doc. 230-10; Doc. 238-1.)

trade shows and competitions, including the "Chalice Cup"[6] festivals in California. At the 2016 Chalice Cup, BBK representatives visited CCA's Raw Garden booth and spoke with CCA employees who were promoting the Raw Garden brand. One BBK representative, Michael D'Aquisto, "traded some [of BBK's] RAW [rolling] papers for two hats with the 'Raw Garden' name on them." (Doc. 203 at 12.) D'Aquisto gave his business card to CCA's representatives and discussed a potential partnership through which Raw Garden cannabis could be packaged using RAW cones. Another BBK representative, Rodney Peters, later posted an image of a Raw Garden-branded hat alongside RAW rolling papers, cannabis, and a RAW tray to an Instagram account used to advertise BBK products. A screenshot of the Instagram post was later sent to BBK's general counsel, Brendan Mahoney.

BBK claims CCA has infringed its RAW trademarks by producing, using, advertising, distributing, selling, and offering to sell its products under the Raw Garden brand. BBK initiated the instant action on September 18, 2019. BBK's Amended Complaint (the operative complaint) alleges seven claims: trademark infringement, false designation of origin, and anti-cybersquatting under the Lanham Act; trademark infringement and unfair competition under Arizona's common law; a petition to void several trademark applications due to a lack of bona fide intent to use the relevant trademark in commerce in violation of the Lanham Act; and false advertising under the Lanham Act. (Doc. 60 at 40–47.) On May 4, 2021, the Court granted CCA's motion to dismiss the false advertising claim but declined to dismiss the petition to void CCA's trademark applications for a lack of bona fide intent to use. (Doc. 151.) CCA now moves for summary judgment on BBK's infringement, false designation of origin, anti-cybersquatting, and unfair competition claims. (Doc. 203.)

In addition to contesting the merits of BBK's claims, CCA raises a number of affirmative defenses, including laches, waiver, estoppel, acquiescence, statute of limitations, and unclean hands. (Doc. 169 at 24–25.) CCA also alleges two counterclaims:

---

[6] Chalice Cup was a cannabis festival held annually in southern California. (Doc. 203-17 at 8; Doc. 203-26 at 5.)

a petition to cancel several BBK trademark registrations for fraud on the United States Patent and Trademark Office ("PTO"), and a petition to cancel the same registrations for unlawful use. (Doc. 169 at 57–59.)

In its cross-motion for summary judgment (Doc. 293), BBK seeks summary judgment on all of CCA's affirmative defenses, each of CCA's counterclaims, and its petition to void CCA's trademark applications for a lack of bona fide intent to use. The parties have also filed numerous motions to exclude each other's expert witnesses.

## II.    LEGAL STANDARDS

### A.    *Daubert*

A party offering expert testimony must establish that the testimony satisfies Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As gatekeepers, trial judges make a preliminary assessment as to whether expert testimony is admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993). Specifically, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. To meet the requirements of Rule 702, an expert must be qualified, the expert's opinion must be reliable in that it is based on sufficient facts or data and is the product of reliable principles and methods, and the expert's testimony must fit the case such that the expert's opinion is relevant. *Id.*

at 589–95.

The Rule 702 inquiry is "flexible." *Id.* at 594. The focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. Because the requirements of Rule 702 are conditions for determining whether expert testimony is admissible, a party offering expert testimony must show by a preponderance of the evidence that the expert's testimony satisfies Rule 702. Fed. R. Evid. 104(a); *see also Lust v. Merrell Dow Pharms. Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

**B.    Summary Judgment**

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citations omitted); *see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) (holding that the court determines whether there is a genuine issue for trial but does not weigh the evidence or determine the truth of matters asserted).

Where, as here, the "parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations and internal quotations omitted). The summary judgment standard operates differently depending on whether the moving or non-moving party has the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When the movant bears the burden of proof on a claim at trial, the movant "must establish beyond controversy every essential element" of the claim based on the undisputed material facts to be entitled to summary judgment. *S. Cal.*

*Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). If the movant fails to make this showing, summary judgment is inappropriate, even if the non-moving party has not introduced contradictory evidence in response. When, on the other hand, the non-movant bears the burden of proof on a claim at trial, the movant may prevail either by citing evidence negating an essential element of the non-movant's claim or by showing that the non-movant's proffered evidence is insufficient to establish an essential element of the non-movant's claim. *See Celotex*, 477 U.S. at 322–23; 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727.1 (4th ed. 2022).

## III.   DISCUSSION

### A.   *Daubert* Motions

Both parties have moved to exclude one another's experts. Because the experts' opinions are material to the Court's evaluation of the parties' motions for summary judgment, the Court will first address the parties' motions to exclude.

BBK moves to exclude or limit the opinions of five CCA experts: Dr. David Blackburn, Dr. Tülim Erdem, Dr. Elisabeth Honka, Khurshid Kohja, and Thomas Tiderington. CCA opposes each motion. CCA, in turn, moves to exclude or limit the opinions of six BBK experts: Lance Ott, Ian Kobe, Dr. On Amir, Francis Burns, Dr. Jeffrey Stec, and Louis Maiellano. Like CCA, BBK opposes each motion. Because the Court will grant CCA summary judgment on BBK's trademark infringement claims, the Court will not reach the parties' arguments regarding BBK's disgorgement claim. Accordingly, the Court will not address the motions to exclude damages experts Francis Burns (Doc. 311) and Dr. David Blackburn (Doc. 298).

#### 1.   Dr. Jeffrey Stec

BBK retained Dr. Jeffrey Stec, a consumer survey expert, to opine regarding the likelihood of consumer confusion. CCA moves to exclude both Dr. Stec's testimony and the survey evidence upon which he relies. (Doc. 314.) CCA gives three reasons: First, Dr. Stec improperly employed the Squirt survey methodology, *see SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1089 (8th Cir. 1980), rather than the Eveready methodology, *see*

*Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 387 (7th Cir. 1976).[7] Second, he surveyed the wrong population because he did not limit survey respondents to only cannabis *concentrate* consumers. And finally, his survey is "unreliable" evidence of confusion because it returned a low net confusion rate.

In the Ninth Circuit, survey evidence should be admitted "as long as [it is] conducted according to accepted principles and [is] relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (alteration in original) (quoting *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997)). "Admissibility of a survey is a threshold question that must be resolved by a judge." *M2 Software, Inc., v. Madacy Ent.*, 421 F.3d 1073, 1087 (9th Cir. 2005). "Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001).

CCA claims Dr. Stec's testimony should be excluded because he employed the Squirt survey format, rather than the Eveready format. Under the Squirt format, respondents are shown both the senior and junior marks[8] and then asked whether the products associated with the mark come from the same or a different source. A Squirt survey does not assume that respondents are familiar with the senior mark. 6 McCarthy on Trademarks and Unfair Competition § 32:174.50 (5th ed.). Thus, the Squirt format is appropriate principally where a case involves "marks that are weak, but are simultaneously or sequentially accessible in the marketplace for comparison." Jerre B. Swann, *Likelihood of Confusion Studies and the Straightened Scope of Squirt*, 98 Trademark Rep. 739, 755–56 (2008).

Under the Eveready format, on the other hand, the survey does not inform

---

[7] While the title of the case from which "Eveready" derives its name is in fact "*Ever-Ready*," courts and commentators generally omit the hyphen. *See, e.g.*, 6 McCarthy § 32:174.

[8] In the instant case, BBK's RAW mark is the senior mark and CCA's Raw Garden mark the junior mark.

- 7 -

respondents what the senior mark is, but instead assumes they know of the mark from their prior experience. 6 McCarthy § 32:174. Respondents are shown only the junior, allegedly infringing mark, and are then asked open-ended questions about whether they associate it with another mark. *See Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, No. 18-cv-81606, 2019 WL 7376782, at *3 (S.D. Fla. Sept. 26, 2019). The Eveready format, therefore, is especially useful when the senior mark is "top of mind"—readily recognized by consumers in the relevant universe. Jerre B. Swann, *Eveready and Squirt—Cognitively Updated*, 106 Trademark Rep. 727, 733–34 (2016) ("'Top-of-mind' refers to marks that are readily accessible in memory. . . . The Eveready format is thus the gold standard for assessing confusion as to (readily recalled) top-of-mind marks; but not all commercially strong marks are cognitively stored top-of-mind; and the Eveready format is thus not appropriate for all strong marks."). CCA claims Dr. Stec should have used the Eveready format in this case because "there is no evidence showing the Raw Garden and RAW marks exist in physical or temporal proximity in the marketplace" and because "BBK's own claims and evidence [purport to show] that its RAW mark is widely recognized in the market." (Doc. 314 at 13–14.)

While CCA may disagree with Dr. Stec's decision to use the Squirt format, he adequately explained his decision and conducted his survey according to generally accepted principles. Squirt surveys are broadly accepted by courts in the Ninth Circuit, particularly where (as here[9]), the senior user's and junior user's brands overlap in the marketplace. *See Fortune Dynamic*, 618 F.3d at 1037–38; *see also* Swann, *Eveready and Squirt—Cognitively Updated*, at 742 (the Squirt methodology is "appropriate in assessing the likelihood of whether brands that, in the real world, are frequently encountered in physical or temporal proximity will be seen as so physically or conceptually similar or related that they are deemed to go or belong together"). Thus, while CCA is right that Squirt surveys generally return higher net confusion rates than Eveready surveys, *see* 6 McCarthy

---

[9] CCA's contention that "there is no evidence showing the [parties'] marks exist in physical or temporal proximity in the marketplace" is belied by the undisputed evidence that the parties' goods are sold in "hundreds of the same dispensaries in California." (Doc. 246 at 30.)

§ 32:174.50, that fact alone does not render such surveys inadmissible. Rather, CCA may readily illustrate the inadequacies in Dr. Stec's survey through vigorous questioning on cross examination and through its own likelihood of confusion expert.

CCA next argues Dr. Stec's opinions should be excluded because he surveyed the wrong universe: *all* users of cannabis products, rather than users of cannabis concentrate products. "In a traditional case claiming 'forward' confusion . . . the proper universe to survey is composed of the *potential* buyers of the junior user's goods or services." 6 McCarthy § 32:161 (emphasis added). Dr. Stec reasonably determined that all cannabis consumers were potential consumers of CCA's concentrate and vape products. And he adequately explained the reasons for that determination in his report. (Doc. 314-1 at 13.) Further, CCA itself appears to have made the same determination when designing some of its own business surveys. (*See* Doc. 439 at 13; Doc. 439-1.) Thus, insofar as CCA disagrees with Dr. Stec's chosen universe, its concern goes to weight rather than admissibility, and can be borne out through cross examination at trial.

CCA's finally argues Dr. Stec's survey is not "reliable" evidence of consumer confusion because the survey returned only a low net confusion rate. This argument is easily dismissed. "The focus [of the Rule 702 inquiry], of course, must be solely on principles and methodology, not on the conclusions that they generate." *See Daubert*, 509 U.S. at 595. The net confusion results returned by Dr. Stec's consumer confusion survey go to the survey's weight, not its admissibility. CCA's motion (Doc. 314) will therefore be denied.

### 2.    Dr. Tülim Erdem

CCA engaged Dr. Tülim Erdem to respond to the opinion of BBK's consumer confusion expert, Dr. Stec. BBK moves to exclude Dr. Erdem's opinions because, in its view, she played no part in designing or conducting the survey on which those opinions are based. Instead, the survey "was designed by CCA's litigation counsel and conducted at counsel's direction by CCA's regular marketing-research firm, MFour, whose employees have *no* training or experience in conducting trademark consumer confusion

surveys." (Doc. 302 at 6.)

As mentioned above, survey evidence should be admitted "as long as [it is] conducted according to accepted principles and [is] relevant." *Fortune Dynamic*, 618 F.3d at 1036 (alteration in original). BBK offers several reasons why the challenged survey was not "conducted according to accepted principles." First, the survey's creator "did not qualify as an expert on designing or analyzing consumer surveys," *M2 Software*, 421 F.3d at 1087, since the survey was designed either by litigation counsel or by MFour personnel with no training or experience in designing consumer confusion surveys. Second, the survey did not focus on the proper universe. And third, the survey asked "leading introductory questions" and "confidence-challenging follow-up questions" that were impermissibly suggestive and distorted responses.

To begin, the evidence does not support BBK's assertion that the survey was "actually designed and implemented" by CCA's counsel. (Doc. 302 at 7.) Although counsel identified the survey's objectives and target population, MFour employees, including Allyson Wehn, designed and administered the survey. (*See* Doc. 302-2 at 5, 20, 74.) Further, while CCA did provide MFour several of the survey questions, that alone does not render the entire survey subject to exclusion. *See, e.g.*, *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, No. 16-cv-03059, 2019 WL 5328730, at *5 n.4 (S.D. Cal. Oct. 21, 2019) ("[T]he fact that one portion of the survey was drafted by Plaintiff's counsel does not mean the entire survey should be excluded under Ninth Circuit precedent.").

Counsel's assistance in designing and creating a survey does not generally warrant exclusion. *See* 6 McCarthy § 32:166 ("While some authority indicates that a survey is flawed if an attorney is involved in designing the questions to be asked, this cannot be a correct criticism."). Indeed, although "it is improper for an attorney to single handedly design and conduct a survey without the assistance of a professional," the attorney's "cooperation with the survey professional in designing the survey is *essential* to produce relevant and usable data." *Id.* (emphasis added). This is only logical; survey experts are not legal experts. In a case such as this, involving complex questions of

federal trademark law, counsel's guidance is needed to frame survey parameters and ensure relevance. In general, then, counsel's involvement draws a survey's admissibility into question only when the survey is designed *exclusively* by counsel without the assistance of a survey professional,[10] *Elliot v. Google Inc.*, 45 F. Supp. 3d 1156, 1167–68 (D. Ariz. Sept. 11, 2014), or when counsel administers the survey directly, 6 McCarthy § 32:166 ("The only relevant limitation is that the attorneys do not *conduct* the survey."). Neither occurred here. Thus, CCA's counsel's involvement will not preclude admission of either the survey or of Dr. Erdem's related testimony.

BBK next claims that Dr. Erdem's testimony and the survey are inadmissible because "the conclusions in Dr. Erdem's report do not match the conditions" of the MFour survey. Whereas the survey focused only on "consumers who've purchased Cannabis concentrate products at least 1x in the past 12 months," and "exclude[d] purchasers of vape products entirely," Dr. Erdem's opinions were based on "people who prefer vapes and concentrates." (Doc. 302 at 14–15.) The MFour survey was indeed underinclusive. The undisputed evidence shows that CCA sells vape products, in addition to concentrate products. Thus, in assessing forward confusion, vape consumers, like concentrate consumers, should have been surveyed. While the survey did list "Cannabis Vape Oil Product" as an option respondents could select as their "preferred way of consuming Cannabis" (*see* Doc. 434-8 at 7–8), those who selected that option were excluded from the survey results.[11] (Doc. 302-1 at 6.) *See* 6 McCarthy § 32:161 ("In a traditional case claiming 'forward' confusion . . . the proper universe to survey is composed of the potential buyers of the junior user's goods or services.").

---

[10] Despite BBK's arguments to the contrary, Ms. Wehn was qualified to design and conduct the survey. Indeed, she testified in her deposition that she has been designing and administering consumer surveys for more than 20 years. (Doc. 302-2 at 78.) She easily satisfies the requisite standard. *See Elliott v. Google, Inc.*, 860 F.3d 1151, 1160 (9th Cir. 2017) ("[V]alid survey design typically requires graduate training *or professional experience in survey research*." (emphasis added) (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 364 (3d ed. 2011))).

[11] Although Dr. Erdem testified at deposition that the term "concentrate" often implicitly includes vape products (*see* Doc. 302-3 at 26–27), because the MFour survey listed "Cannabis Vape Oil Product" and "Cannabis Concentrate Product" separately (*see* Doc. 302-1 at 5), such inclusivity was clearly not implied here.

Even having concluded the survey was underinclusive, the question remains whether it should be excluded from evidence. The Court concludes that it should not. Although the universe surveyed was plainly not the optimal one, it was also not so "significantly skewed away from the proper group of people whose perception is at issue" as to render it inadmissible. 6 McCarthy § 32:159. The survey is therefore admissible and BBK's objection affects only its weight. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Third, BBK argues that the survey and Dr. Erdem's opinions are inadmissible because the survey asked impermissibly suggestive "leading introductory questions" and "confidence-challenging follow-up questions" (Doc. 302 at 18), in addition to the traditional Eveready questions.[12] Ms. Wehn testified at deposition that the introductory questions were intended to assess the degree of care exercised by cannabis consumers. (Doc. 302-2 at 7, 16–17.) BBK claims that these questions created distorting "demand effects."[13] Even if true, though, BBK's objection again goes to weight, not admissibility: "'[T]echnical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Fortune Dynamic*, 618 F.3d at 1036 (quoting *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988)).

The survey's follow-up questions are also not grounds for exclusion. These questions were intended to assess consumers' confidence and ensure that their responses were more than mere guesswork. (*See* Doc. 434-9 at 20.) While such questions may not ordinarily be included in an Eveready survey, their inclusion does not so distort the

---

[12] As described above, in an Eveready survey, respondents are shown the junior user's product and are asked to identify the company that (a) puts out, (b) sponsors or approves, or (c) has a business affiliation or connection to the product. *See Ever-Ready Inc.*, 531 F.2d 366.

[13] "'Demand Effects' in a survey are produced when respondents use cues from the survey procedures and questions to infer the purpose of the survey and identity the 'correct' answers." 6 McCarthy § 32:172.

survey's results as to render them wholly inadmissible. Indeed, there is literature suggesting that such questions *enhance* survey reliability. *See* Barton Beebe, Roy Germano, Christopher Jon Sprigman & Joel Steckel, *The Role of Consumer Uncertainty in Trademark Law: An Experimental and Theoretical Investigation* 49 (NYU Law & Econ. Working Paper No. 21-13, 2021) ("[W]e believe that testing for consumer belief strength will significantly improve the utility of trademark survey evidence."). To the extent BBK believes that these confidence-gauging questions introduced bias, it may produce its own evidence and ask probing questions on cross-examination to that effect at trial.

BBK finally contends that even if the survey was conducted in accordance with accepted principles, CCA cannot *show* that it was, because neither Dr. Erdem nor Dr. Honka have the requisite knowledge regarding the survey's design or implementation. Relatedly, BBK argues that because Drs. Erdem and Honka lack such knowledge, their testimony cannot be adequately tested on cross examination. (Doc. 304 at 8.) The Court is again unpersuaded. Both experts will be subject to cross examination and, should such examination demonstrate their lack of knowledge regarding the survey on which they relied in forming their opinions, the jury will have ample opportunity and reason to discount those opinions. In addition, since BBK's counsel was able to depose MFour personnel, including Ms. Wehn, during discovery regarding the survey, BBK has any information that may undermine the survey's reliability at trial. Indeed, as CCA notes, BBK may even play relevant portions of the deposition at trial, if necessary. (Doc. 434 at 16 (citing Fed. R. Civ. P. 32(a)(4)(b)).) BBK's motion (Doc. 302) will accordingly be denied.

### 3.    Dr. On Amir

Dr. On Amir was retained by BBK to opine regarding the "degree of care likely to be exercised" by consumers of CCA's goods. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979). Dr. Amir is a professor of marketing at the University of California at San Diego. Dr. Amir seeks to opine that CCA's consumers exercise a

low degree of care in making their purchasing decisions. CCA moves to exclude Dr. Amir's testimony in its entirety. CCA makes several arguments. First, Dr. Amir is not qualified to offer an opinion on the degree of care exercised by cannabis consumers, because he is not an expert on the cannabis industry. Second, Dr. Amir's opinions are not based on reliable methodology. Third, Dr. Amir's conclusions are unsupported by the data on which he relies. And fourth, some of Dr. Amir's opinions are not helpful to the trier of fact.

CCA's first contention is easily dismissed. Dr. Amir is clearly qualified to opine regarding the degree of care consumers exercise in making purchasing decisions. Dr. Amir has extensive education and experience in the field of marketing and consumer behavior. (*See* Doc. 433-1 at 2.) Although Dr. Amir does not have experience in the cannabis industry, he explained in his deposition that the same consumer behavior principles at issue in this case apply broadly across industries. (*See* Doc. 439-1 at 6 ("Marketing is marketing. The same principles apply everywhere.").) Further, a lack of specialization generally goes to the weight of an expert's testimony, rather than its admissibility. *See In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 899 (C.D. Cal. 2004) ("A court abuses its discretion when it excludes expert testimony solely on the ground that the witness's qualifications are not sufficiently specific if the witness is generally qualified. A lack of specialization affects the weight of the expert's testimony, not its admissibility.").

Dr. Amir bases his opinions primarily on a series of surveys conducted by MFour for CCA's business use. The surveys were designed to assess the behavior of CCA's actual and potential customers and are used by CCA to inform its business decisions. CCA objects to Dr. Amir basing his opinions on these surveys. Its objections, however, are unpersuasive. Many of CCA's supposed objections to Dr. Amir's "methodology" in fact are objections to his conclusions. For example, much of CCA's motion is devoted to its contention that the survey results do not in fact mean what Dr. Amir says they mean. (*See* Doc. 433 at 11–14.) Disagreements with an expert's

conclusions, however, cannot form the basis of a motion to exclude under *Daubert*. *See Daubert*, 509 U.S. at 589 (the Rule 702 inquiry must focus "solely on principles and methodology, not on the conclusions that they generate."). Dr. Amir's conclusions may instead be challenged on cross examination and through the testimony of CCA's own witnesses. *See In re Nw. Airlines Corp. Antitrust Litig.*, 197 F. Supp. 2d 908, 927 (E.D. Mich. 2002) ("Plainly, to the extent that Defendants and their experts have applied a similar methodology and merely reached a different conclusion, such a 'battle of the experts' must be resolved by the trier of fact.").

CCA further objects that the surveys do not focus on the proper universe: "consumers of cannabis concentrate and/or vape oils products." (Doc. 433 at 12.) As BBK notes, however, MFour elected, in consultation with CCA itself, to survey a broader population of cannabis users. (Doc. 439 at 13.) This choice reflects CCA's apparent belief that all cannabis users are potential purchasers of its Raw Garden products. (*Cf.* Doc. 439-1 at 13 ("[I]t's very easy to argue that it's likely that people who are cannabis buyers are potential customers.").) Thus, because the degree of care exercised by both current and potential CCA consumers is relevant, the surveyed universe does not provide grounds for exclusion. *See M2 Software*, 421 F.3d at 1089 ("The district court's instructions also properly and explicitly directed the jury to consider the degree of care of 'potential buyers.'").

CCA does not contend that the surveys relied on by Dr. Amir are themselves unreliable. Such an argument would in fact be dubious, given that the surveys were conducted for CCA's own business use. *See Chase Fed. Sav. & Loan Ass'n v. Chase Manhattan Fin. Servs. Inc.*, 681 F. Supp. 771, 780 (S.D. Fla. 1987). Indeed, CCA's knowledge of the surveys' background, design, and implementation helps ameliorate concerns regarding the admissibility of Dr. Amir's opinions. To the extent CCA believes the surveys do not support Dr. Amir's conclusions, it is uniquely positioned—having commissioned and helped design the surveys—to expose any inadequacies or inconsistencies in Dr. Amir's opinions. There is no reason to believe a jury would not

1   understand or give weight to CCA's arguments.[14] *See Southland Sod Farms v. Stover*
2   *Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997) ("[A]s long as they are conducted
3   according to accepted principles . . . survey evidence should ordinarily be found
4   sufficiently reliable under *Daubert*. Unlike novel scientific theories, a jury should be able
5   to determine whether asserted technical deficiencies undermine a survey's probative
6   value.").

### 4.     Dr. Elisabeth Honka

8          CCA retained Dr. Elisabeth Honka to respond to Dr. Amir's conclusions and to
9   give her opinion regarding the degree of care exercised by consumers. BBK now moves
10  to exclude her testimony in full. (Doc. 304.) BBK advances two arguments. First, Dr.
11  Honka cannot establish that the MFour survey is the product of reliable principles and
12  methods. Thus, both the survey and Dr. Honka's opinions based on it are accordingly
13  inadmissible. (*Id.* at 6–8.) The Court rejected this argument in the forgoing section and
14  need not do so again here. *See infra* Subsection III.A.3. Second, the survey does not
15  support Dr. Honka's opinions because it fails to assess whether reasonable consumers
16  would take sufficient time to distinguish between the parties' product lines, and instead
17  assesses only consumers' brand sensitivity and the importance of brand to consumers'
18  purchasing decisions. (Doc. 304 at 9–11.) The Court also rejects this argument and will
19  allow Dr. Honka to testify.

20         Brand sensitivity is relevant in assessing the degree of consumer care. Brand
21  sensitive consumers are likelier to exercise a high degree of care in making purchases
22  than are consumers who are not brand sensitive. *See Glow Indus., Inc. v. Lopez*, 252 F.
23  Supp. 2d 962, 1001 (C.D. Cal. 2002). Thus, the survey provides relevant, if not
24  dispositive, evidence of the degree of care exercised by CCA's consumers. Such
25  evidence directly supports Dr. Honka's opinions. The Court will therefore deny BBK's

---

27  [14] CCA also contends that Dr. Amir should be precluded from testifying regarding the
    likelihood of consumer confusion. Because BBK's response assures that "Dr. Amir will
28  not be asked to, nor will he, offer any opinions at trial on any aspect of consumer confusion,
    except the consumer degree of care factor" (Doc. 439 at 16), the Court need not address
    CCA's argument.

motion to exclude.

### 5.    Lance Ott

CCA moves to exclude BBK's expert Lance Ott, who was retained to testify regarding issues related to the California cannabis market. (Doc. 307.) Mr. Ott has been involved in the cannabis industry for more than two decades, during which he has provided various strategic, financial, and banking services to cannabis companies. (Doc. 307-1 at 2.)  He was directed by BBK to offer his opinion regarding the following questions:

> A.  Was there a for-profit commercial cannabis market operating in compliance with California state and local laws and regulations in 2016? If not:
>
> > 1.  When did a for-profit commercial cannabis market emerge under state and local laws and regulations in California?
> >
> > 2.  What were the characteristics of transactions in cannabis products allowed in California under its state and local laws and regulations before the emergence of a commercial, for-profit cannabis market in California?
>
> B.  When could a for-profit entity in California first participate in for-profit, commercial sales of cannabis products allowed under California state and local laws and regulations?
>
> C.  What kinds of customer experiences occurred at cannabis dispensaries in California in 2016 and how, if at all, did those experiences change between 2016 and present?

(*Id.* at 3–4.) CCA contends that Mr. Ott's responses to questions A, A.1., A.2, and B consist of legal conclusions and are therefore inadmissible. (Doc. 307 at 2, 7–8.) In response, BBK contends that Mr. Ott's testimony is admissible because he merely references the law as a necessary backdrop to his testimony regarding the California cannabis market. (Doc. 332 at 13–16.)

Mr. Ott's opinions must be excluded. Despite BBK's insistence to the contrary, his opinions are essentially legal. For example, the section of his report entitled "Basis for

- 17 -

Opinions" provides a four-page overview of the scope and effect of various laws, including the Compassionate Use Act ("CUA"), the Medical Marijuana Program Act ("MMPA"), Proposition 64, and the Medicinal and Adult-Use Cannabis Regulation and Safety Act. (Doc. 307-1 at 4–7.) His opinions, in turn, are no more than his subjective interpretations of those laws. For example, in opining "there was not a for-profit, commercial cannabis market operating in compliance with California state and local laws" in 2016, Mr. Ott's report provides:

> Before 2018, the early CUA did not permit any sales of cannabis and the subsequent MMPA, while permitting more transactions, expressly stated that it did not permit any for-profit cultivation or distribution of cannabis. Therefore, in my opinion, any commercial for-profit cannabis sales in California prior to 2018 were outside of what was permitted even under California law, making them illegal 'black market' transactions.

(*Id.* at 8.) This is an impermissible legal conclusion. Mr. Ott, however, has no legal training or experience. (*See* Doc. 307-3 at 4–5, 27–28.) Accordingly, he is plainly unqualified to render such an opinion. *See* Fed. R. Evid. 702; *JIPC Mgmt., Inc. v. Incredible Pizza Co.*, No. 08-cv-04310, 2009 WL 8591607, at *5 (C.D. Cal. July 14, 2009).

Even if Mr. Ott qualified as a legal professional, his opinion would yet be inadmissible, since "resolving doubtful questions of law is the distinct and exclusive province of the trial judge." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (quoting *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993)); *see also Arista Networks, Inc. v. Cisco Sys. Inc.*, 2018 WL 8949299, at *5 (N.D. Cal. June 15, 2018) ("An expert's testimony may not interpret the law for the court or advise the court about how the law should apply to the facts of a particular case." (cleaned up)); *Pinal Creek Grp. v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1042 (D. Ariz. 2005) ("The principle that legal opinion evidence concerning the law is inadmissible is so well-established that it is often deemed a basi[c] premise or

assumption of evidence law—a kind of axiomatic principle."). The Court will therefore grant CCA's motion to exclude.

### 6.   Khurshid Kohja

BBK moves to exclude the opinions of Khurshid Kohja. (Doc. 305.) Kohja, a California attorney, was retained by CCA to respond to the testimony of Lance Ott. His testimony, like Mr. Ott's, consists of impermissible legal conclusions and seeks to improperly usurp the Court's role. The Court will therefore grant BBK's motion to exclude.

### 7.   Ian Kobe

CCA moves to exclude the testimony of Ian Kobe. (Doc. 308.) Mr. Kobe is BBK's "creative director and head of product development" and has been with BBK since 2010. (Doc. 308-1 at 2.) BBK plans to elicit both lay and expert testimony from Mr. Kobe at trial. (*See* Doc. 333 at 5.) CCA moves to exclude both aspects of Mr. Kobe's testimony in full. The Court, however, declines to address Mr. Kobe's lay testimony at this juncture.[15] The admissibility of such testimony is better reserved for a motion in limine prior to trial. The Court will therefore address CCA's motion to exclude only insofar as it challenges Mr. Kobe's expert opinions.

BBK seeks to elicit expert testimony from Mr. Kobe regarding the "similarity of the marks" likelihood of confusion factor. *Sleekcraft*, 599 F.2d at 349. As the name suggests, that factor assesses the similarity of the defendant's mark to the plaintiff's mark. The greater the similarity between the two marks, the greater the likelihood of confusion. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000). Mr. Kobe intends to refute CCA's contention that the parties' marks are dissimilar. In particular, he plans to opine that, although the RAW mark is principally red, and the Raw Garden mark principally green, companies frequently use different colors on product packaging even within the same product and brand lines. (Doc. 333 at 5–6.) In the words of his

---

[15] The Court notes that because BBK has retained another expert, Dr. Jeffrey Stec, to opine regarding the commercial strength of the RAW mark, CCA is correct that Mr. Kobe may not offer expert opinion to that effect. (*See* Doc. 31 at 4.)

expert report, "a change in color is often used to signify different product types in a single line or brand of products." (Doc. 308-1 at 4.) In addition, Mr. Kobe plans to opine that "the color green is commonly used in product packaging to identify products made from or associated with cannabis." (Doc. 308-1 at 4, 5.)

CCA moves to exclude both of these opinions for three reasons. First, Mr. Kobe's opinion about companies' use of different colors is plainly not "beyond the common knowledge of the average layperson." *Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009). Thus, that opinion will not be "helpful" to the factfinder under Rule 702. Second, Kobe is not qualified to opine about the use of the color green by cannabis companies. Third, Kobe's opinion about cannabis marketing strategy is founded on unreliable methodology.

Rule 702 requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). This means, among other things, that "the subject matter at issue must be beyond the common knowledge of the average layman." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002). This is not an especially exacting inquiry. Indeed, the Ninth Circuit has counseled that courts "must be cautious not to overstate the scope of the average juror's common understanding and knowledge." *Id.* at 1013; *see also Lawson v. Trowbridge*, 153 F.3d 368, 376 (7th Cir. 1998) ("A trial court 'is not compelled to exclude [an] expert just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension.'"). Nevertheless, courts in this circuit "continue[] to guard . . . from expert elucidation, areas believed to be within the jurors' common understanding." *United States v. Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993).

As mentioned above, Mr. Kobe plans to opine that "a change in color is often used to signify different product types in a single line or brand of products." (Doc. 308-1 at 4.) This opinion embraces an issue within the average juror's understanding. The fact that companies use different colors to identify different products, even within a single brand, is well understood. Indeed, Mr. Kobe's own examples illustrate how commonplace

this practice is. (*See, e.g.*, Doc. 308-1 at 5 (explaining that Coca Cola uses a red can for regular Coke, a silver can for Diet Coke, and a black can for Coke Zero).) His testimony, therefore, will not be "helpful" to the jury within the meaning of Rule 702 and Ninth Circuit precedent.

Mr. Kobe also seeks to offer the following opinions regarding the use of the color green by cannabis companies: (1) "the color green is commonly used in product packaging to identify products made from or associated with cannabis, both marijuana and hemp" (Doc. 308-1 at 5); (2) "the cannabis market is so saturated with product packaging and store signage using the color green that the color green is commonplace in the cannabis market" (*id.* at 6); and (3) "the use of the color green on the Raw Garden packaging for cannabis products does not . . . serve to identify the source of the Raw Garden products but serves only as some identification that the Raw Garden products are cannabis products or otherwise associated with cannabis" (*id.* at 21).

These opinions are admissible. First, despite CCA's assertions to the contrary, Mr. Kobe is qualified to opine regarding cannabis packaging design based on his 28 years of professional experience in graphic and packaging design and his considerable experience working alongside cannabis companies on design-related issues. (Doc. 333 at 11.) *See Sundby v. Marquee Funding Grp., Inc.*, No. 19-cv-00390, 2020 WL 5535357, at *6 (S.D. Cal. Sept. 15, 2020) (allowing expert to testify based on work experience); *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004) ("Rule 702 contemplates a *broad conception* of expert qualifications.").

Second, Mr. Kobe's methodology, though based primarily on experience, rather than formulaic processes, is sufficiently reliable to permit his testimony. "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Lucido v. Nestle Purina Petcare Co.*, 217 F. Supp. 3d 1098, 1102 (N.D. Cal. 2016). As BBK notes in its opposition: "Here, Mr. Kobe's reliance on his professional experience with packaging design and on articles discussing packaging design within the cannabis industry is rationally related to his ultimate conclusions and is an acceptable

methodology." (Doc. 333 at 13.) CCA's motion to exclude will be granted in part and denied in part.

### 8.    Thomas Tiderington

As discussed above, CCA brings two counterclaims against BBK, which seek to invalidate a number of BBK's trademark registrations. The counterclaims allege that BBK's products are unlawful "drug paraphernalia" under the CSA and that BBK obtained the PTO registrations by fraud. (Doc. 71 at 49–51.) CCA hired Thomas Tiderington, the Chief of Police in Plymouth, Michigan, to give his opinion on whether BBK's rolling papers and other products constitute illegal "drug paraphernalia" under the CSA. BBK moves to exclude Chief Tiderington's testimony on three grounds: First, his opinions are irrelevant because they do not address the correct provisions of the CSA. Second, his opinions are unreliable because they are not based on any actual application of the CSA. And third, because Tiderington serves as a police chief, the jury will give undue weight to his testimony, and thereby prejudice BBK. (*See* Doc. 306 at 6.)

BBK's concern that the jury will give undue weight to Chief Tiderington's testimony is puzzling, since the parties agree CCA's counterclaims will be tried to the bench. (*See, e.g.*, Doc. 406.) *See United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) ("When the district court sits as the finder of fact, there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself."). The Court, of course, will not give undue weight to Chief Tiderington's opinions simply because he is a police chief.

Nevertheless, the Court agrees with BBK that Tiderington's testimony is irrelevant because, as discussed in additional detail below, *see infra* Subsection III.C.3.ii, his opinions are focused principally on the factors set forth in 21 U.S.C. § 863(a) and (e), which factors are inapplicable where the "tobacco exemption" applies. *See Lifted Ltd., LLC v. Novelty, Inc.*, No. 16-cv-03135, 2021 WL 4480566, at *3 (D. Colo. September 30, 2021) ("[T]he tobacco exemption removes from Section 863's purview any item that is traditionally intended for use with tobacco, regardless of any of the other factors in the

statute. Section 863(f)(2) states that '[t]his section *shall not apply*' to products traditionally intended for use with tobacco." (alteration and emphasis in original)); *see also* 21 U.S.C. § 863(f) ("This section *shall not apply* to . . . any item that, in the normal lawful course of business, is . . . traditionally intended for use with tobacco products, including any pipe, paper, or accessory." (emphasis added)). In addition, to the extent Chief Tiderington does give opinions regarding the tobacco exemption, he straightforwardly concedes that he is not qualified do so. (Doc. 293-24 at 4.) Accordingly, the Court concludes his testimony is inadmissible and BBK's motion will be granted.

### 9.    Louis Maiellano

BBK intends to offer at trial expert opinion testimony from Louis Maiellano regarding the tobacco exemption. In particular, Mr. Maiellano will opine that BBK's products are traditionally intended for use with tobacco and therefore come within the tobacco exemption. (Doc. 317-1 at 2.) CCA moves to exclude, because his opinions are not based on scientific, technical, or other specialized knowledge; his methodology is unreliable, since he fails to analyze key objective factors informing traditional intended use; and he improperly offers an opinion on the ultimate issue. (Doc. 317.)

Mr. Maiellano is well qualified to opine on the roll-your-own segment of the tobacco industry and the question whether BBK's products are traditionally intended for use with tobacco. *See Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) (holding that trial court abused its discretion in determining witness with 38 years of experience in property damage repair was not qualified as an expert);  His qualifications are set forth in detail in both his report (Doc. 317-1 at 3–4) and BBK's opposition (Doc. 331 at 10–11) and will not be belabored here. This "specialized knowledge" he gained through extensive experience obviously informed his opinions in this case.

He also based his opinions on adequate facts and data. Though much of his research was conducted online and is publicly accessible, that fact has no bearing on whether his opinions are reliable and admissible. Publicly available information, no less than

proprietary information, may serve as the basis for expert testimony. Indeed, though the information on which Mr. Maiellano relied may be public, the application of such information in order to reach a conclusion in this case required his expertise. And Maiellano made that fact clear during his deposition. (Doc. 331-1 at 3–4.)

CCA's next argues Maiellano's methodology was unreliable because he ignored "objective factors" in formulating his opinions. (Doc. 317 at 10.) The Court is not persuaded. CCA's argument is based on the following language: "An item can only be 'traditionally intended for use with' tobacco by reference to history, past practice, and other objective factors." *United States v. Dyer*, 750 F. Supp. 1278, 1287 (E.D. Va. 1990). As an initial matter, this language comes from a decision of a district court outside this circuit and is therefore not binding on this Court. Even if it were, however, it would not require Mr. Maiellano's opinions to be excluded. The language does not set forth a formulaic test for assessing whether an item is traditionally intended for use with tobacco. Instead, it expresses the simple notion that to determine what an item is "traditionally intended" for, one must look to objective historical factors. The language's surrounding context makes this clear. In the immediately preceding sentences, the court stated: "In a 1988 amendment to the [CSA] Congress substituted the phrase 'traditionally intended for use with' for the then existing phrase 'primarily intended for use with.' Congress' choice of the modifier 'traditionally' confirms the statute's objective standard." *Id.* Thus, the court's mention of "history, past practice, and other objective factors" was offered to distinguish between the relevant, objective evidence a court may consider and the irrelevant, subjective evidence a court may not, such as evidence of what the defendant "primarily intended" its goods to be used for. Maiellano's opinions are consistent with this approach, as they are founded on the basis of objective, historical evidence.

Maiellano also does not impermissibly opine on the ultimate issue. Instead, he opines principally that rolling papers, rolling machines, cigarette tubes, rolling trays, shredders, and various other products, are traditionally intended for use with tobacco. These opinions do not constitute improper legal testimony. *See Hangarter v. Provident*

*Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) ("[A] witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible." (quoting *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988)). CCA's motion will be denied.

**B.     CCA's Motion for Partial Summary Judgment**

The Court will now address CCA's motion for partial summary judgment (Doc. 203.) As mentioned above, CCA seeks summary judgment on Counts I–V of BBK's Amended Complaint. For the reasons given below, the Court will grant CCA's motion. Because the Court finds that there is no likelihood of consumer confusion, the Court declines to address CCA's assertions that BBK's claims are barred by laches and that BBK's disgorgement claim fails because CCA's profits were accrued in violation of the Controlled Substances Act.

**1.     Likelihood of Consumer Confusion**

CCA contends that, even accepting BBK's version of the facts, there is no likelihood of consumer confusion. CCA is right. "The core element of trademark infringement is the likelihood of confusion." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999). "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002). The Ninth Circuit uses the eight *Sleekcraft* factors to guide the likelihood of confusion analysis: (1) strength of the mark; (2) the proximity or relatedness of the companies' goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting its mark; and (8) the likelihood of expansion into other markets. *Sleekcraft*, 599 F.2d at 348–49.

This same eight-factor analysis governs BBK's trademark infringement and unfair competition claims under Arizona common law. *See Taylor v. Quebedeaux*, 126 Ariz.

515, 516 (1980) ("[T]he essence of unfair competition is confusion of the public.");
*Moab Indus., LLC v. FCA US, LLC*, No. 3:12-cv-08247-HRH, 2016 WL 5859700, at *7
(D. Ariz. Oct. 6, 2016) ("Under Arizona law, the universal test for unfair competition is
whether the public is likely to be confused." (cleaned up)).

### i.        Similarity of the Marks

"The first *Sleekcraft* factor—the similarity of the marks—has always been
considered a critical question  in the likelihood-of-confusion analysis." *GoTo.com.*, 202
F.3d at 1205; *see also Brookfield Commc'ns*, 174 F.3d at 1054 ("The similarity of the
marks will always be an important factor."). "Obviously, the greater the similarity between
the two marks at issue, the greater the likelihood of confusion." *GoTo.com*, 202 F.3d at
1206. Three axioms guide the Court's analysis on this factor. First, "the court is to view
the marks as a whole, as they appear in the marketplace," *E. & J. Gallo Winery v. Gallo
Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992), rather than taking a "deconstructionist
view of the different components of the marks," *Active Network, Inc. v. Elec. Arts Inc.*,
No. 10-cv-01158, 2010 WL3463378, at *3 (S.D. Cal. Aug. 31, 2010); s*ee also Exxon
Corp. v. Texas Motor Exch., Inc.*, 628 F.2d 500, 505 (5th Cir. 1980) ("[S]imilarity of design
is determined by considering the overall impression created by the mark as a whole rather
than simply comparing individual features."). Second, because similarities may be more
than merely visual, the marks must be compared "in terms of appearance, sound, and
meaning." *GoTo.com*, 202 F.3d at 1206. Third, "similarities are weighed more heavily
than differences." *Id.*

The marks are vaguely similar in sound and meaning. The word "raw" appears
in both, in all capital letters, with the same spelling.[16] *See Ultimate Creations, Inc. v. THQ
Inc.*, No. 05-cv-01134, 2008 WL 215827, at *3 (D. Ariz. Jan. 24, 2008) ("[B]ecause
Defendant uses the exact word as Plaintiff's registered mark, there is a greater likelihood

---

[16] The Court is unpersuaded by BBK's conclusory claim that because it owns a "family"
of RAW marks, CCA's use of the word "garden" suggests Raw Garden is "just another
member of the family of marks" (Doc. 246 at 28–29). "Simply using a series of similar
marks does not of itself establish the existence of a family." *J & J Snack Foods Corp. v.
McDonald's Corp.*, 932 F.2d 1460, 1463 (Fed. Cir. 1991).

of confusion."). The word "raw" also conveys the same meaning in connection with both marks: both companies use the word to evoke the impression that their goods are natural or unprocessed. The marks also sound somewhat similar, since both incorporate the identical word "raw." On the other hand, however, because the word "raw" is always accompanied by "garden" when used in connection with CCA's goods, the marks do not sound identical. The marks' aural similarity, moreover, is less significant here than in cases involving products purchased primarily by verbal order. *See* 4 McCarthy § 23:22. Also, because the marks' supposed aural and semantic similarity hinges exclusively on their shared use of an exceptionally common word,[17] such similarity is highly dubious. *See Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 445 (9th Cir. 1980) ("[S]election of a mark with a common word . . . 'naturally entails a risk of some uncertainty and the law will not assure absolute protection.'" (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978))).

Visually, the marks are not similar. In CCA's case, the words "Raw Garden" generally appear in green on a white background (or, occasionally, in white on a green background), in a moderately sized, sans serif font with irregular outlines. The words are of equal significance in the mark, in the sense that neither "Raw" nor "Garden" predominates. The words are also accompanied by a large, two-leaf sprout that features prominently in the mark. In BBK's mark, in contrast, "RAW" generally appears in capitalized and bolded red letters, in a large serif font, on a tan background. "RAW," unlike "Raw Garden," usually appears alone, unaccompanied by other words or symbols. And, even when combined with other elements, the word "RAW" predominates. This visual dissimilarity weighs strongly against a likelihood of confusion. *See Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) ("Even if the trade names are similar, the likelihood of confusion is reduced if the two trademarks, taken as a whole, are visually distinct.").

---

[17] For example, there are more than 1,000 live, third-party trademark registrations using the term "raw."




The companies' RAW and Raw Garden branded packaging is also visually dissimilar. *See Stone Brewing Co. v. MillerCoors LLC*, 445 F. Supp. 3d 1113, 1132 (S.D. Cal. 2020) ("Packaging is certainly a factor in the overall appearance of a mark in the marketplace."); *see also Packman v. Chi. Trib. Co.*, 267 F.3d 628, 644 (7th Cir. 2001) ("Different packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of confusion."). Whereas CCA's products are ordinarily packaged in cubic, white boxes with the Raw Garden logo appearing in only moderate size, BBK's products (e.g., its rolling papers) are packaged in rectangular, tan boxes on which "RAW" appears in large, prominent lettering. The presentation of the marks on the boxes in which the companies' products are placed is quite distinct, and reduces the likelihood that consumers would be confused. *See Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 997 (C.D. Cal. 2002) ("The manner in which the products are presented in the marketplace accordingly minimizes the likelihood that consumers will conclude they emanate from the same source.").





The Court holds that the marks create significantly different commercial impressions, such that consumers could readily distinguish between the parties' products as they appear in the marketplace. *See Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240,

1245 (9th Cir. 1984) ("The pens' dissimilar appearance, the dominance of the company marks and logos on the pens themselves and on all packaging and promotional material, and the dissimilar and distinctive packaging and advertisement designs overcome the similarity of the marks considered in isolation. Insofar as the marks are encountered in a marketplace permitting visual examination of the pens themselves or their packaging or promotional material . . . the marks are readily distinguishable."). Even weighing similarities more heavily than differences, as the Court must, the visual dissimilarity between the companies' marks and product packaging renders consumer confusion unlikely. *See Glow Indus.*, 252 F. Supp. 2d at 997 ("[T]he packaging used by plaintiff and defendants for their fragrance products is quite different, and tends to minimize any confusion generated by the similarity in the sound and meaning of the trademarks."). This factor heavily favors CCA and, indeed, militates strongly in favor of summary judgment on BBK's infringement claims. *See Brookfield Commc'ns*, 174 F.3d at 1054 ("Where the two marks are entirely dissimilar, there is no likelihood of confusion. . . . Nothing further need be said.").

### ii.        Proximity of the Parties' Goods

On the next factor, the Court assesses the relatedness of the parties' products. Related goods are, of course, likelier than unrelated goods to confuse consumers. *See Brookfield Commc'ns*, 174 F.3d at 1055. "To determine whether goods are related, courts may consider whether the goods are complementary, whether the products are sold to the same class of purchasers, and whether the goods are similar in use and function." *Pinder v. 4716 Inc.*, 494 F. Supp. 3d 618, 639 (D. Ariz. 2020) (quotation omitted). The ultimate question is whether the products "would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 n.10; *see also Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir. 1963) ("The use need not be the same as, nor one in competition with the original use. The question is, are the uses related so that they are likely to be connected in the mind of a prospective purchaser?"); *Brookfield Commc'ns*,

174 F.3d at 1056 ("[T]he focus is on whether the consuming public is likely somehow to associate [the junior user's] products with [the senior user]." (quoting *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1130–32 (9th Cir. 1998)).

BBK offers evidence suggesting consumers could mistakenly associate the companies' products. First, there is evidence indicating the parties' goods can be used together. Specifically, CCA's co-founder, Thomas Martin, stated in his deposition that CCA's concentrate products could be applied to cannabis flower and smoked in BBK rolling paper (Doc. 246 at 28), as did CCA's former employee, Samantha Brown (Doc. 246 at 28). In addition, CCA recently began selling a new, Raw Garden branded "pre-roll" product, which combines marijuana flower with "refined live resin crushed diamonds" (a marijuana concentrate) in rolling paper. (Doc. 397.) This product demonstrates that, despite CCA's earlier arguments (*see* Doc. 203 at 22), some of the parties' goods are, in fact, complementary.[18]

On the other hand, the relationship between the parties' products is somewhat attenuated. CCA does not, for example, sell cannabis flower, which could easily be combined with BBK's rolling papers. Instead, CCA's products must first be applied to cannabis flower, and only then can they be combined with BBK's rolling papers. Thus, BBK's products are perhaps more closely related to recreational cannabis products generally than to CCA's oil and resin products specifically. *See Sunenblick v. Harrell*, 895 F. Supp. 616, 629 (S.D.N.Y. 1995) (finding the goods unrelated where "[the defendant's] products are addressed to a somewhat esoteric market").

Second, record evidence shows the parties' products are sold "in hundreds of the same dispensaries in California," which suggests the goods are in some sense related. (Doc. 246 at 28.) While the fact that the companies' products are sold under the same roof does not compel a finding that they are related, *see, e.g.*, *Woodstock Ventures LC v.*

---

[18] BBK moves to further supplement the summary judgment record (Doc. 400). Because record evidence already demonstrates that the parties' products are sold in many of the same retail locations, and because leave to supplement the record with evidence of CCA's new pre-roll product was previously granted (Doc. 395), the Court will deny BBK's motion.

*Woodstock Roots, LLC*, 387 F. Supp. 3d 306, 318 (S.D.N.Y. 2019), *aff'd*, 837 F. App'x 837 (2d Cir. 2021) ("The different nature of Plaintiffs' and Defendants' products tempers any findings of competitive proximity." (cleaned up)), it nevertheless weighs in favor of confusion, *see* 4 McCarthy § 24:45. This is especially true where, as here, the retail location is insular or specialized and sells only a narrow range of products. *Cf. Recot, Inc. v. Becton*, 214 F.3d 1322, 1330 (Fed. Cir. 2000).

On the other hand, the companies' products do not directly compete or overlap.[19] CCA sells "cannabis concentrate products" whereas BBK sells "tobacco and related products, including cigarette rolling papers and smoking accessories." (Doc. 203 at 22.) *See* 4 McCarthy § 24:23 ("'[C]ompetitive' goods . . . are goods that are reasonably interchangeable by buyers for the same purposes."). While direct competition between the parties' goods is of course not required, *see Brookfield Commc'ns*, 174 F.3d at 1056, its absence does make consumer confusion somewhat less likely, 4 McCarthy § 24:22 ("Where the goods . . . are directly competitive, the degree of similarity of marks needed to cause likely confusion is less than in the case of dissimilar goods."). In addition, the goods are not sold at similar prices. For example, CCA's .5-gram "Refined Live Resin PAX ERA Pod" product sells for roughly $46, and its 1.0-gram Raw Garden live resin concentrate for roughly $63, while BBK's RAW products range in price from $4.30 for 300 rolling papers to $26.99 for 100 cones. (Doc. 203 at 29.) This price disparity suggests that distinct groups of consumers purchase the parties' products and, accordingly, that confusion is less likely to occur. That said, companies often sell products with differing prices under a single brand.

On balance, the Court holds that the evidence is sufficient for a factfinder to conclude that the parties' goods are proximate. The tobacco and cannabis industries, though distinct, are adjacent, and consumers could reasonably conclude that BBK expanded into the cannabis concentrate market. Thus, while there is some evidence

---

[19] While both companies sell nearly identical branded merchandise (e.g., hats, T-shirts, and water bottles), such merchandise is sold only for promotional purposes, and is merely incidental to the companies' core cannabis and smoking-accessory products. *See Pinkette Clothing*, 894 F.3d at 1028.

1    pointing in both directions, this factor weighs slightly in BBK's favor and in favor of a

2    likelihood of confusion.

3                       **iii.**      **Strength the Mark**

4          "The scope of the trademark protection that we give marks depends upon the

5    strength of the mark, with stronger marks receiving greater protection than weak ones."

6    *Entrepreneur Media*, 279 F.3d at 1141. Although BBK argues its marks are incontestable

7    (*see* Doc. 246 at 8), a claim CCA does not dispute (*see* Doc. 203 at 20), "the incontestable

8    status of [a] mark does *not* require a finding that the mark is strong." *Entrepreneur Media*,

9    279 F.3d at 1142 n.3; *see also* 6 McCarthy § 32:155 ("The status of incontestability

10   relates solely to the *validity* of the registered mark. The . . . commercial and marketplace

11   strength of the mark relates solely to the separate issue of *infringement* of the mark.").

12   Rather, a strong mark is one that is likely to be "remembered and associated in the public

13   mind with the mark's owner." *Brookfield Commc'ns*, 174 F.3d at 1058. Thus, regardless

14   of whether a mark has obtained incontestable status, the strength of a mark is assessed

15   based on the mark's conceptual strength and commercial strength. *See Stone Creek, Inc.*

16   *v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("The strength of the

17   mark is a key factor with two components: the mark's recognition in the market (*i.e.*, its

18   commercial strength) and the mark's inherent distinctiveness (*i.e.*, its conceptual

19   strength).")*, abrogated on other grounds by Romag Fasteners, Inc. v. Fossil, Inc.*, 590

20   U.S. ⸻, 140 S. Ct. 1492 (2020).

21                       **a.**      **Conceptual Strength**

22         The conceptual strength of a mark "is determined by its placement on a continuum

23   of marks." *Entrepreneur Media*, 279 F.3d at 1141 (quoting *E. & J. Gallo Winery*, 967

24   F.2d at 1291). "The strongest marks—that is, those which receive the maximum

25   trademark protection—are 'arbitrary' or 'fanciful.' The weakest marks, entitled to no

26   trademark protection, are 'generic.' In between lie 'suggestive' and 'descriptive' marks;

27   suggestive marks have the greater strength of the two." *Id.* A "descriptive" mark is just

28   that: descriptive. It "define[s] qualities or characteristics of a product in a straightforward

way that requires no exercise of the imagination to be understood." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998); *see also Brookfield Commc'ns*, 174 F.3d at 1058 n.19 ("Descriptive terms directly describe the quality or features of the product."). A mark is "suggestive," on the other hand, when "a consumer must use imagination or any type of multistage reasoning to understand the mark's significance." *Kendall-Jackson Winery*, 150 F.3d at 1047 n.8. Thus, a suggestive mark, as the name implies, "does not *describe* the product's features, but *suggests* them." *Id.* The strongest marks are "arbitrary" and "fanciful" marks. *Entrepreneur Media*, 279 F.3d at 1141. These marks "have no intrinsic connection to the product with which the mark is used." *Brookfield Commc'ns*, 174 F.3d at 1058 n.19.

Because the dividing line between these categories of marks, and particularly descriptive and suggestive marks, is rather murky, the categorizing decision frequently is "made on an intuitive basis rather than as the result of a logical analysis susceptible of articulation." *Ever-Ready Inc.*, 531 F.2d at 379; *see also Fortune Dynamic*, 618 F.3d at 1033 ("Categorizing trademarks is necessarily an imperfect science. Far from being neatly distinct and discrete, trademark categories often 'blur at the edges and merge together.'" (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983)).

Courts have developed two "tests" to help distinguish between suggestive and descriptive marks. One is the "imagination test," which asks whether, and how much, a consumer must use her imagination to understand the message conveyed by the mark about the quality or characteristics of the product. 2 McCarthy § 11:67. Another is the "competitors' need test," which asks whether the message conveyed by the mark about the product is so direct that it is likely to be needed by competitive sellers to describe their own products. *Id.* § 11:68. These tests go hand in hand, since "the more imagination that is required to associate a mark with a product or service, the less likely the words used will be needed by competitors to describe their products or services." *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1117 (9th Cir. 2010).

BBK's "RAW" mark is either descriptive or suggestive. "Raw" has several dictionary definitions including: "being in or nearly in the natural state: not processed or purified," "unprepared or imperfectly prepared for use," and "not being in polished, finished, or processed form." *Raw*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/raw (last visited June 23, 2022). At least with regard to BBK's rolling papers (BBK's flagship product), "RAW" is used in this descriptive sense. According to BBK's website, its rolling papers are "pure and RAW," "produced with no genetically modified organisms or animal-based products," "vegan friendly and natural," and contain "[a] blend of naturally unbleached plant fibers and are finished with the purest natural gumline to match." (Doc. 205-2.) Thus employed, RAW obviously describes a feature of BBK's rolling papers: their natural, unmodified quality. On the other hand, understanding the connection between the term RAW and BBK's rolling papers arguably requires a leap in logic indicative of a suggestive mark. *See Brookfield Commc'ns*, 174 F.3d at 1058. The connection is not so obvious, for example, as the one between the mark "Honey Baked Ham" and the product it describes. *See Schmidt v. Quigg*, 609 F. Supp. 227 (E.D. Mich. 1985). Nevertheless, "merely descriptive marks need not describe the essential nature of a product; it is enough that the mark describe *some aspect* of the product." *See Zobmondo Ent.*, 602 F.3d at 1116 (emphasis added).

The evidence is inconclusive regarding whether BBK's competitors are likely to need to use the term "raw" to describe their products. BBK avers that several of its competitors sell rolling papers and other smoking accessories and none use the term "raw" to do so. (*See* Doc. 229-2 at 5–6.) CCA, in contrast, has evidence suggesting that tobacco and tobacco accessory companies often employ the term "raw" in describing their products. (*See, e.g.*, Docs. 204-2, 204-3, 204-4, 204-14.) The competitors' need test thus offers only limited utility in this instance.

On balance, the Court holds that BBK's RAW mark is likely descriptive and at most suggestive. In either case, the mark's conceptual strength weighs against finding a likelihood of consumer confusion. *See Brookfield Commc'ns*, 174 F.3d at 1058.

### b.    Commercial Strength

A mark's commercial strength, unlike its conceptual strength, depends on its "marketplace recognition value." *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 508 (9th Cir. 2011); *see also Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 452 n.14 (E.D. Va. 2019) ("Conceptual strength focuses on the linguistic uniqueness of the plaintiff's mark, whereas commercial strength hinges on whether consumers in fact associate the plaintiff's mark with a unique source."). Thus, although a mark may initially be conceptually weak, it may become strong by achieving actual, widespread recognition in the marketplace. *See Brookfield Commc'ns*, 174 F.3d at 1058; *see also M2 Software*, 421 F.3d at 1081 ("[A]n otherwise inherently weak mark 'may be strengthened by such factors as extensive advertising, length of exclusive use, [and] public recognition.'" (quoting *Entrepreneur Media*, 279 F.3d at 1144)).

There is record evidence suggesting the RAW mark is commercially strong. First, BBK has sold RAW branded products for almost two decades, and such products are sold in retail locations in all 50 states. (Doc. 229-2 at 3, 6.) Second, RAW product sales have increased steadily over time. (*Id.* at 6.) Third, BBK's annual expenditures promoting the RAW brand are substantial. Its promotional channels include annual tobacco catalogs, internet advertisements, point of sale materials, sponsorships, contests, and trade shows. (*Id.* at 7.) Fourth, BBK's websites and social media accounts that promote RAW products reach millions of people. (Doc. 231-4.) And finally, a survey conducted by BBK expert Dr. Stec indicates 30.8% of consumers of rolling papers recognize the mark and associate it with a single company. (Doc. 230-8 at 3–4.) But this evidence, while probative, does not compel a finding that the RAW mark is strong.

First, commercial strength can be determined only in context. "While evidence of advertising and sales is relevant to prove the strength of a mark, standing alone without context, such evidence may not be sufficient to prove that a mark is relatively strong." 2 McCarthy § 11:81. Although BBK has given its sales and advertising figures, it has provided no evidence permitting the Court to place those figures in context. The figures

could be extraordinary for a company in the tobacco accessories industry, thereby indicating the success and strength of the RAW brand, or they could be merely typical for such a company, suggesting that the RAW brand is not especially strong. Absent additional context, the Court simply cannot tell. Thus, while BBK's raw sales and advertising expenditures are substantial, and serve as some evidence of commercial strength, the figures are perhaps less probative than they might otherwise be.

Second, the evidence (especially the survey evidence) fails to establish that the RAW mark is well recognized among *CCA's* consumers. Yet that is the ultimate question in a case involving forward confusion: whether consumers of the junior user's products will mistakenly believe those products are associated with the senior user. 4 McCarthy § 23:10. Indeed, evidence that only 30% of consumers in BBK's *own* principal market recognize its RAW mark militates against the conclusion that the mark is so strong as to render confusion likely in other, adjacent markets. *See* 2 McCarthy § 11:77 ("Some cases decide a trademark conflict for the junior user by saying that while plaintiff's mark is strong in its own market, it is weak in defendant-junior user's market. Of course, this is a euphemism for saying that plaintiff's mark is not strong enough to do the job of preventing this use in another market.").

In sum, BBK has not shown, even accepting its version of the facts, that it has so strengthened its inherently weak mark through commercial success as to suggest a likelihood of confusion. *See Brookfield Commc'ns*, 174 F.3d at 1058; *Entrepreneur Media*, 279 F.3d at 1144. This factor weighs in CCA's favor.

### iv.    Evidence of Actual Confusion

The next factor accounts for evidence of actual confusion. Evidence of actual confusion is evidence "that use of the two marks has already led to confusion" among consumers. *Sleekcraft*, 599 F.2d at 352. Evidence of past confusion is, obviously, "persuasive proof that future confusion is likely." *Id.* Because such evidence can be difficult to obtain, however, "actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act." *Acad. of Motion Picture Arts & Scis. v. Creative*

*House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991); *see also Brookfield Commc'ns*, 174 F.3d at 1050 ("[A]ctual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy."). Nevertheless, a lack of evidence of actual confusion, especially when the marks have coexisted for a significant period of time, can serve as evidence that future confusion is unlikely. *See, e.g.*, *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002); *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009); *see also* Restatement (Third) of Unfair Competition § 23 cmt. d (Am. L. Inst. 1995) ("[W]hen the parties have made significant use of their respective designations in the same geographic market for a substantial period of time, the absence of any evidence of actual confusion may in some cases justify an inference that the actor's use does not create a likelihood of confusion."). Two sorts of evidence are probative of actual confusion: evidence of actual instances of confusion and survey evidence. *See Fortune Dynamic*, 618 F.3d at 1035–36; 4 McCarthy § 23:17.

The record contains no evidence of actual instances of confusion. Although BBK asserts that statements made by its founder and CEO Brad Kesselman in his deposition create a genuine dispute of fact on this issue, that is not the case. While Mr. Kesselman testified at deposition "that he is aware of several persons who have purchased Raw Garden branded cannabis products believing that the product is related to . . . the RAW brand" (Doc. 203-16 at 17), he was unable to identify even a single individual who expressed such confusion (Doc. 203-20 at 19–20, 22–24). Even at the summary judgment stage, Mr. Kesselman's self-serving deposition testimony, without more, fails to create a triable issue of fact regarding evidence of actual instances of confusion. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("[T]his court has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996))). This is especially true because BBK's 30(b)(6) witness

1  stated he was unaware of any actual confusion.[20] (Doc. 203-18 at 23.)

2      Indeed, the dearth of evidence of actual confusion in this case, though usually

3  innocuous, may weigh in CCA's favor. Since RAW and Raw Garden products have

4  coexisted in the marketplace for several years,[21] including in "hundreds of the same

5  dispensaries in California" (*see* Doc. 246 at 28), one might expect BBK to have

6  *some* evidence of actual confusion. *See Cohn*, 281 F.3d at 842. It does not. Thus, while

7  the absence of such evidence is of course not dispositive, it counsels in CCA's favor.

8      Survey evidence, though not indeed evidence of "actual" confusion, is also

9  probative under this factor. *See Fortune Dynamic*, 618 F.3d at 1035 ("Survey evidence

10 may establish actual confusion." (quoting *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305

11 F.3d 894, 902 (9th Cir. 2002))); *see also* 4 McCarthy § 23:17 ("Most surveys do not

12 measure actual confusion. Surveys only give us information about a controlled and

13 artificial world from which we are asked to draw inferences about the real world."). BBK

14 provides evidence from two surveys conducted by Dr. Jeffrey Stec[22]: one presenting the

15 products as they would appear in cannabis dispensaries and the other presenting the

16 products as they would appear in an online store.[23] (Doc. 314-1 at 13.) The surveys

17 employed a "modified Squirt" approach in which respondents were first shown an image

18 of RAW rolling papers and were then shown an image of Raw Garden products in a

19 "product array" with products of other cannabis brands.[24] Respondents were then asked

20 whether they thought any of the products were "put out by," "sponsored or approved by,"

21 or "affiliated or connected to" the company that sold the rolling papers. (*Id.* at 21–24.) If

---

[20] In addition, Mr. Kesselman's testimony is almost certainly inadmissible hearsay, as the out-of-court statements of BBK customers he references are being offered to prove that consumers were, in fact, confused. Fed. R. Evid. 801(c); *see also* Fed. R. Civ. P. 56(c)(2).

[21] While the parties disagree over when Raw Garden products began being sold in the marketplace, sales were occurring by no later than 2016.

[22] As described above, this evidence is admissible notwithstanding the technical deficiencies outlined by CCA. *See supra* Subsection III.A.1; *see also Fortune Dynamic*, 618 F.3d at 1037–38. That the evidence is admissible, however, has no bearing on whether it can establish a likelihood of consumer confusion.

[23] The two versions of the survey were identical except for the images used.

[24] Both surveys also used a control group. The survey questions were the same for the control and test groups, except that "Raw Garden" was changed to "Red Garden" throughout. (Doc. 314-1 at 31–33.)

respondents answered in the affirmative, they were asked to identify which product or products in particular they believed were associated with RAW rolling papers. (*Id.* at 24.) For each product selected, the respondents were asked "[w]hat specifically makes [them] believe" the product was associated with RAW rolling papers.[25] (*Id.* at 25.)

The surveys revealed that, after controlling for respondents' "pre-existing beliefs, guesses, and other background noise," 12.4% of respondents who participated in the in-store version of the survey, and 11.4% of respondents who participated in the online version of the survey, identified Raw Garden cannabis products as being sponsored or approved by, or affiliated or connected with, RAW rolling papers.[26] (*Id.* at 6–7.) While these net confusion rates are not so low as to constitute strong evidence *against* a likelihood of confusion, *see* 6 McCarthy § 32:189, nor are they so high as to constitute persuasive evidence in *favor* of confusion. *See Newport Pac. Corp. v. Moe's Sw. Grill, LLC*, No. 05-cv-00995, 2006 WL 2811905, at *14 (D. Or. Sept. 28, 2006). In fact, "survey confusion numbers that go below 20% need to be carefully viewed against the background of other evidence weighing for and against a conclusion of likely confusion." 6 McCarthy § 32:188. Given the marks' visual dissimilarity and the relative paucity of other evidence weighing in favor of confusion, Dr. Stec's survey evidence fails to create a triable issue of fact regarding a likelihood of consumer confusion. "Likelihood of confusion requires that confusion is 'probable, not simply a possibility.'" *Newport Pac. Corp.*, 2006 WL 2811905, at *17 (quoting *Cohn*, 281 F.3d at 842).

### v.    Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. In assessing this factor, the critical question is whether "the general class . . . of purchasers exposed to the products overlap." *Id.*; *see also Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014) ("In assessing marketing channel

---

[25] Both surveys were limited to respondents who indicated they were 21 years or older, were California residents, and had shopped for cannabis in the last six months. (Doc. 314-1 at 14–15.)

[26] CCA contends that after the methodological flaws in Dr. Stec's survey are corrected, the real net confusion rate is between 3.7% and 8.3%. Percentages in this range are evidence that confusion is *not* likely. 6 McCarthy § 32:189.

convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products.").

RAW and Raw Garden branded products are sold in "hundreds of the same dispensaries in California." (*See* Doc. 246 at 30.) BBK and CCA also regularly attend the same trade shows, where they market RAW and Raw Garden branded products to consumers. (Doc. 231-8 at 6.) The fact that the parties use these same marketing and distribution channels serves as some evidence of overlapping consumer bases. Consumers are more likely to associate CCA's products with BBK's brand when both companies' products are sold in the same retail locations, especially where those locations are relatively small and specialized.[27] *See* 4 McCarthy § 24:45 ("If both plaintiff's and defendant's goods are sold in the same stores, especially if available nearby each other within a store, this tends to increase the likelihood that buyers will think the goods come from the same source, even though they are not competitive products.").

On the other hand, BBK's own founder, Mr. Kesselman, has emphasized that the parties operate in distinct markets and serve distinct consumers. When asked in his deposition about BBK's connection to the cannabis industry, Mr. Kesselman stated succinctly that "we don't live in that world." (Doc. 203-20 at 37.) Furthermore, the fact that only a fraction of BBK's RAW-branded rolling papers are sold in cannabis dispensaries, whereas CCA sells Raw Garden-branded products exclusively through licensed cannabis dispensaries, cuts against BBK. (Doc. 203 at 27.) *See, e.g.*, *Fortune Dynamic*, 618 F.3d at 1038. So too does the evidence suggesting CCA markets its products to a distinct and sophisticated subclass of cannabis consumers. (*See, e.g.*, Doc. 206-34 at 4–5.)

Nevertheless, because the undisputed evidence shows that "the general class of

---

[27] The fact that both companies market their products extensively on the internet and social media "merits little weight," since "the same could be said of countless companies." *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004); *see also Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) ("Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion.").

purchasers" exposed to the parties' products overlap at least somewhat, this factor favors BBK. *Pom Wonderful*, 775 F.3d at 1130.

### vi.   Degree of Consumer Care

The next *Sleekcraft* factor assesses the degree of care likely to be exercised by consumers of the junior user's goods. 599 F.2d at 353. "The reference point for this factor 'is the typical buyer exercising ordinary caution.'" *Fortune Dynamic*, 618 F.3d at 1038 (quoting *Sleekcraft*, 599 F.2d at 353). When consumers exercise a high degree of care, they are less likely to be confused. *See Brookfield Commc'ns*, 174 F.3d at 1060 ("We expect [a consumer] to be more discerning—and less easily confused—when he is purchasing expensive items and when the products being sold are marketed primarily to expert buyers."). Conversely, when consumers exercise a low degree of care, they are more likely to be confused. *Id.*

On the one hand, CCA's products are fairly inexpensive. For instance, a .5-gram refined live resin pod product retails for $46, while a 1.0-gram Raw Garden live resin concentrate retails for $63. Even assuming these products are costly relative to CCA's competitors' products, they are not so costly that a reasonable buyer would inherently exercise substantial care in purchasing them. Contrast the cost of CCA's products, for example, with that of a car, a boat, or a diamond ring. *See Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1095 (C.D. Cal. 2003) (car); *Sleekcraft*, 599 F.2d 341 (boat); *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 91 (2d Cir. 2020) (diamond ring).

On the other hand, certain consumers exercise a high degree of care even when purchasing products that are not "extravagantly priced." *Glow Indus.*, 252 F. Supp. 2d at 1001–02; *see also* 4 McCarthy § 23:99. This often occurs, for example, when something about the nature of the product leads consumers to be more discriminating. *See Glow Indus.*, 252 F. Supp. 2d at 1001–02. One court, for instance, has held that consumers exercise a high degree of care when purchasing ingestible health products. *Reeves v. Gen. Nutrition Ctrs., Inc.*, No. 10-cv-01653, 2012 WL 13018362, at *7 (C.D. Cal. Apr. 2,

2012). In so holding, the court reasoned that "[a]lthough the goods at issue here are not particularly expensive, which is often the basis for finding a higher degree of care, they are specialty goods targeted at 'particular' and discerning consumers." *Id.* So too here. While CCA's concentrate products are inexpensive, they are specialty goods aimed at sophisticated and experienced cannabis users. (Doc. 203 at 28.) *See* Ninth Circuit Manual of Model Civil Jury Instructions § 15.18 ("The more sophisticated the potential buyers of the goods or the more costly the goods, the more careful and discriminating the reasonably prudent purchaser exercising ordinary caution may be."). Further, the fact that CCA's Raw Garden products all include THC, a psychoactive ingredient, suggests that consumers would exercise care in making their purchasing decisions. As one judge in this circuit has opined, "it stands to reason that consumers intending to ingest cannabis would exercise a higher degree of care in selecting their product, and that customers might study a product's label to determine how potent they wish their confection to be." *Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 894 n.13 (N.D. Cal. 2019).

The parties also introduce competing expert and survey evidence regarding the degree of care exercised by CCA's consumers. Dr. Amir, BBK's degree-of-care expert, opines that CCA's own surveys show that consumers do not exercise substantial care in purchasing CCA's products. (*See* Doc. 433-1 at 8.) Dr. Honka, in contrast, opines that CCA's consumers are uniquely brand sensitive and do exercise a high degree of care. (Doc. 434-11 at 15, 21–22.) The Court cannot resolve this factual dispute on summary judgment. Even accepting Dr. Amir's opinions as correct, however, this factor does not weigh obviously in BBK's favor, given the unique, psychoactive nature of cannabis products and the aforementioned (and generally undisputed) evidence that CCA's consumers tend to be sophisticated, experienced cannabis users. Accordingly, this factor does not favor either party.

### vii.    Defendant's Intent

This factor is of "minimal importance" in assessing a likelihood of consumer confusion, *GoTo.com*, 202 F.3d at 1208, since "an intent to confuse customers is not

required for a finding of trademark infringement." *Brookfield Commc'ns*, 174 F.3d at 1059. The Court will therefore note only that there is no evidence in the record that CCA acted with the principal intent of confusing consumers. *See Brookfield Commc'ns*, 174 F.3d at 1059.

#### viii.      Likelihood of Expansion

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354. Here, the evidence fails to establish a "strong possibility" that BBK will expand. Although BBK claims it "has plans to enter into the legal cannabis market when that market becomes fully legal under federal law," there is no evidence in the record of concrete expansion plans. Nor is there any way of knowing when the cannabis market might be federally legalized. Thus, BBK's "evidence" consists of nothing more than a mere interest in expanding into the cannabis market at some unknown future date. *See Newport Pac. Corp.*, 2006 WL 2811905, at *16. Accordingly, this factor weighs against a likelihood of confusion.

#### ix.      Summary of Factors

On summary judgment, when the nonmovant bears the burden of proof on a claim at trial, the movant may prevail by showing that the nonmovant's proffered evidence is insufficient to establish an essential element of the nonmovant's claim. *See Celotex*, 477 U.S. at 322–23. While summary judgment is generally disfavored in trademark cases, *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999), it is nevertheless warranted "where the parties do not seriously dispute the underlying material facts and where the court is able to conclude as a matter of law that there is no likelihood of confusion," *Reeves*, 2012 WL 13018362, at *8.

In the instant case, five factors favor CCA, including the weighty similarity of the marks, strength of the mark, and evidence of actual confusion factors. One factor, the degree of care exercised by consumers, is neutral, while only two factors, the proximity

of the parties' goods and marketing channels used, favor BBK. *See Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005) (concluding that "[t]he distribution of the *Sleekcraft* factors does not raise a material issue of fact regarding likelihood of confusion" where only two factors weighed in plaintiff's favor); *see also M2 Software*, 421 F.3d at 1081–83, 1085 (affirming grant of summary judgment when strength of the mark, similarity of the mark, and proximity of the goods factors all favored plaintiff because the others favored defendant). Given the obvious and significant differences between the parties' marks, the absence of actual confusion, and the low net confusion rates generated by the parties' surveys, the Court concludes that no reasonable jury could find for BBK on the likelihood of confusion issue. *See Cohn*, 281 F.3d at 842 (affirming grant of summary judgment where plaintiff's "evidence fail[ed] to create a genuine issue that confusion is probable, not simply a possibility"); *see also Brookfield Commc'ns*, 174 F.3d at 1054 ("Where the two marks are entirely dissimilar, there is no likelihood of confusion."); *Collins v. U.S. Dep't of Veterans Affs.*, 497 F. Supp. 3d 885, 900 (S.D. Cal. 2020) ("Plaintiffs have failed to demonstrate a triable issue of material fact as to a necessary element of their trademark infringement claims.").

Because the Court will grant summary judgment on BBK's infringement claims, including Counts I, II, III, IV, and V of the Amended Complaint (Doc. 60), the Court need not address BBK's claim for disgorgement or CCA's laches or other affirmative defenses.

### C.    BBK's Motion for Partial Summary Judgment

BBK seeks summary judgment on CCA's affirmative defenses, including laches, waiver, acquiescence, estoppel, and unclean hands. (Doc. 293 at 8–19.) BBK also seeks summary judgment on its lack of bona fide intent to use claim (*id.* at 30–32), and on CCA's two counterclaims (*id.* at 10, 20–30). Because the Court will grant CCA summary judgment on BBK's infringement claims, the Court will deny as moot BBK's request for summary judgment on CCA's affirmative defenses.

### 1.    Bona Fide Intent to Use Claim

The Lanham Act sets forth two avenues through which an individual or business can apply to register a trademark. "First, under § 1(a), trademark owners can apply for protection of marks already being 'used in commerce.' Second, under § 1(b), a 'person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce may request registration of its trademark.'" *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 863 (6th Cir. 2017). The latter provision allows an individual or business with a bona fide intent to use a mark in commerce to file an application, often called an "intent-to-use" ("ITU") application, before the mark is actually used in commerce. This permits, upon registration, for the mark to be granted priority based on the ITU application date. *See* 2 McCarthy § 16:2 ("This procedure enables a company to 'reserve a mark' before actually using it in trade."). Because "[a] bona fide intent is a statutory requirement of a valid trademark application under § 1(b)," the absence of such intent is a ground on which an interested individual or business may oppose an application. *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 21 (D.C. Cir. 2008).

For a trademark applicant's intent to be "bona fide," such intent "must be demonstrable and more than a mere subjective belief." *M.Z. Berger & Co. v. Swatch AG*, 787 F.3d 1368, 1375 (Fed. Cir. 2015). Thus, the applicant must show "both actual intent to use a mark in commerce and evidence, contemporary with the application, that objectively demonstrate such an intent." *Aktieselskabet*, 525 F.3d at 21; *see also M.Z. Berger*, 787 F.3d at 1376 ("[W]hether an applicant had a 'bona fide intent' to use the mark in commerce at the time of the application requires objective evidence of intent."). "Although the evidentiary bar is not high, the circumstances must indicate that the applicant's intent to use the mark was firm and not merely intent to reserve a right in the mark." *M.Z. Berger*, 787 F.3d at 1376.

On a motion for summary judgment challenging an ITU application for lack of bona fide intent, the challenger "has the initial burden of demonstrating by a

preponderance of the evidence that [the] applicant lacked a bona fide intent to use the mark on the identified goods." *Kelly Servs.*, 846 F.3d at 865 (quoting *Bos. Red Sox Baseball Club Ltd. v. Sherman*, 88 U.S.P.Q.2d 1581, 2008 WL 4149008, at *6 (T.T.A.B. 2008)). "Once this showing is made, the applicant must either come forward with objective documentary evidence demonstrating bona fide intent, or else provide 'other facts . . . which adequately explain or outweigh [the] applicant's failure to provide such documentary evidence.'" *Id.* (quoting *Honda Motor Co. v. Winkelmann*, 90 U.S.P.Q.2d 1660, 2009 WL 962810, at *2 (T.T.A.B. 2009)) (alterations in original). "As a general rule, the factual question of intent is particularly unsuited to disposition on summary judgment." *Id.* at 864 (quoting *Honda Motor*, 2009 WL 962810, at *2).

Here, BBK seeks to void four ITU applications filed by CCA for lack of bona fide intent to use.[28] (Doc. 60 at 46.) In support of its claim, BBK asserts that during discovery, "CCA produced no document concerning any of the goods listed in the ITU Applications, much less documents showing CCA's alleged intent, as of the dates CCA filed each ITU Application . . . to use in commerce the [Raw Garden] marks on the products covered in the ITU Applications." (Doc. 293 at 31 (emphasis omitted).) In addition, BBK points to CCA's own interrogatory responses, which indicated that, with respect to the goods in the challenged ITU applications, CCA had "no specific date range of planned use, or specific date of intended first use." (Doc. 230-10 at 10.) Finally, BBK cites numerous deposition excerpts indicating that CCA has not taken, and has no immediate plans to take, concrete steps to bring to market any of the identified products to market. (Doc. 293 at 32.)

That CCA has no concrete plans to bring the identified products to market even years after the applications were initially filed, while non-dispositive, suggests that it lacked the bona fide intent to use the mark in connection with the goods at the time of filing. The Court therefore concludes that BBK has satisfied its initial burden of showing

---

[28] The relevant application numbers are: 87/324,212, 88/266,152, 88/328,474, and 88/488,733. (Doc. 293 at 30.) BBK also initially asserted a claim against application 87/324, 208, but CCA abandoned that application, such that BBK's claim is moot as to that application. (*Id.*) After filing its initial ITU applications, CCA divided the '474 and '733 applications to create forty-two child applications. (*See* Doc. 293-27.) BBK's claim regarding the parent applications applies equally to each of the child applications.

CCA lacked a bona fide intent to use in commerce the Raw Garden mark in connection with the identified goods. *See Kelly Servs.*, 846 F.3d at 867 (holding that challenger carried its initial burden where statements made by applicant's CEO demonstrated the lack of a "firm intent[ion]" to the use the mark in connection with certain identified goods); *see also Bos. Red Sox*, 2008 WL 4149008, at *6 (holding that challenger carried its initial burden where applicant claimed the mark for a wide array of products and produced no discovery evidence that it had a genuine commercial capacity to produce all of those products). The burden therefore shifts to CCA to bring forward documentary evidence demonstrating its bona fide intent. CCA has not met its burden.

As evidence of its bona fide intent, CCA directs the Court only to statements made by its COO and CEO, Thomas Martin and John De Friel, during their depositions in this case, and three emails sent by De Friel in 2016. (Doc. 364 at 30–31.) The testimonial evidence is unavailing because it is neither objective nor contemporaneous. *See Aktieselskabet*, 525 F.3d at 21 (a valid ITU application requires "both actual intent to use a mark in commerce and evidence, *contemporary with the application*, that *objectively* demonstrate such an intent." (emphasis added)); *see also* 3 McCarthy § 19:14 ("Congress did not intend the issue to be resolved simply by an officer of the applicant later testifying, 'Yes, indeed, at the time we filed that application, I did truly intend to use the mark at some time in the future.'"). The cited emails are similarly unconvincing, for two reasons. First, the emails involve only CCA's interest in growing hemp or entering the hemp market. (*See* Docs. 366-4, 366-5, 366-6.) As such, they have no bearing on CCA's intent to use the non-hemp products identified in the challenged applications. Thus, CCA has no admissible evidence of its intent to use the Raw Garden mark in connection with the identified non-hemp products. Second, the cited emails fail to give rise to a triable issue of fact even with regard to CCA's ITU applications involving hemp products, because the emails do not evidence CCA's bona fide intent to use the Raw Garden mark with the *particular* products identified in the challenged applications. *See* 3 McCarthy § 19:48. The emails contain only vague discussions regarding De Friel's (and, by extension, CCA's)

general interest entering the hemp market at some unknown future date; they say nothing about dried herbs, candy, bakery products, essential oils, electronic cigarette liquid, or any other products identified in the challenged applications. Such isolated, generalized discussions do not evince a bona fide intent to use the Raw Garden mark in connection with the identified goods. On this evidence, no reasonable jury could find for CCA on BBK's claim. *See L.C. Licensing, Inc. v. Cary Berman*, 86 U.S.P.Q.2d 1883, 2008 WL 835278, at *10 (T.T.A.B. 2008) ("The mere assertion of an intent to use the mark without corroboration of any sort, whether documentary or otherwise, is not likely to provide credible evidence to establish a bona fide intention to use the mark."). BBK's motion will thus be granted, and the Court will order summary judgment in BBK's favor on Count VI of the Amended Complaint (Doc. 60 at 46).

### 2.    CCA's Standing to Assert Counterclaims

BBK next requests summary judgment on CCA's counterclaims because CCA lacks standing to assert claims for cancellation of trademark. (*See* Doc. 293 at 10.) To have standing to seek cancellation of an allegedly invalid trademark registration, a litigant must show that it has a "real interest" in the proceeding. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1376 (Fed. Cir. 2012). "This means that the petitioner 'must show a real and rational basis for his belief that he would be damaged by the registration sought to be cancelled, stemming from an actual commercial or pecuniary interest in his own mark.'" *WM Int'l, Inc. v. Golden Lyon Inv. Co.*, No. 20-cv-00995, 2020 WL 6826485, at *2 (C.D. Cal. Nov. 5, 2020) (quoting *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 349 (9th Cir. 1984)). Put differently, "a real interest in the proceeding" means "a legitimate personal interest" in the trademark's cancellation. *Coach Servs.*, 668 F.3d at 1376.

BBK claims that CCA has no *legitimate* interest in cancelling BBK's trademark registrations because CCA's business is illegal, and all its commercial interests are therefore illegitimate. (Doc. 293 at 10.) This argument has previously been squarely rejected by a district court in this circuit: "While it is a concern that plaintiff could

flagrantly violate federal laws and simultaneously seek the assistance of a federal court of equity to cancel trademarks, nevertheless, defendants began this controversy . . . [and] forc[ed] plaintiff to defend itself. . . . Given that defendants seek relief for alleged trademark infringement arising from registrations which could be invalid, it would be wrong to deny plaintiff the opportunity to defend itself." *Purple Heart Patient Ctr. Inc. v. Mil. Ord. of the Purple Heart*, No. 13-cv-00902, 2014 WL 572366, at *3 (N.D. Cal. Feb. 11, 2014). The court's reasoning applies with equal force in this case. BBK initiated this action and forced CCA to defend itself. It would be manifestly unjust to preclude CCA from challenging the validity of the marks upon which BBK's claims are based.

Denying CCA standing based on the illegality of its business would also be inconsistent with the purpose of the standing requirement. "The purpose in requiring standing is to prevent litigation where there is no real controversy between the parties, where a plaintiff is no more than an intermeddler." *Kleven v. Hereford*, No. 13-cv-02783, 2015 WL 4977185, at *20 (C.D. Cal. Aug. 21, 2015) (quoting *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1028–29 (C.C.P.A. 1982)). But that is plainly not the case here. "Indeed, the fact that [BBK is] seeking to use the trademarks against [CCA] as a sword shows that [CCA] has a real interest in testing the validity of those trademarks. [CCA] is not just an intermeddler, but rather faces a real risk of liability in this case if the trademarks are not cancelled." *WM Int'l*, 2020 WL 6826485, at *2. Thus, CCA has standing to challenge the validity of BBK's trademark registrations. *See id.* ("[N]umerous courts have concluded that being sued for trademark infringement is sufficient injury to confer standing to seek cancellation of a mark.").

### 3. CCA's Counterclaims

CCA seeks cancellation of eleven of BBK's trademark registrations for fraud on the PTO and for unlawful use.[29] (Doc. 169 at 57–59.) BBK moves for summary judgment on CCA's fraud counterclaim because the evidence does not support a finding that BBK

---

[29] The relevant Registration Numbers are 2,989,221; 3,422,929; 4,041,076; 4,074,036; 4,325,822; 4,412,202; 4,647,824; 4,766,952; 4,675,473; 4,921,168; and 5,046,495. (Doc. 169 at 39.)

1    made material misrepresentations to the PTO with knowledge or intent to deceive. (Doc.

2    293 at 20–29.) BBK also seeks summary judgment on CCA's unlawful use counterclaim

3    because BBK's challenged goods qualify for the tobacco exemption from the CSA and

4    because the alleged unlawful use has not been previously determined by a court or

5    government agency. (Doc. 293 at 29–30.)

6                   **i.    Cancellation for Fraud**

7            "A party who believes he has been harmed by a trademark's registration may seek

8    the cancellation of that trademark's registration on certain specified grounds, including

9    that the trademark was obtained by the commission of fraud on the [PTO]." *Hokto*

10   *Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013); *see also* 15

11   U.S.C. § 1064 (petition to cancel registration of a mark may be filed at any time if the

12   registered mark "was obtained fraudulently or contrary to the provisions of section 1054

13   of this title or of subsection (a), (b), or (c) of section 1052 of this title"). Fraud in

14   procuring a trademark occurs only "when an applicant knowingly makes false, material

15   representations of fact in connection with [the] application." *Anhing Corp. v. Thuan*

16   *Phong Co.*, 215 F. Supp. 3d 919, 933 (C.D. Cal. 2015) (quoting *Torres v. Cantine*

17   *Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986)). To prevail on a claim for cancellation

18   based on fraud, therefore, a claimant must have evidence of "(1) a false representation

19   regarding a material fact; (2) the registrant's knowledge or belief that the representation

20   is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4)

21   actual, reasonable reliance on the misrepresentation; and (5) damages proximately

22   caused by that reliance." *Hokto Kinoko*, 738 F.3d at 1097. The party alleging fraud bears

23   the heavy burden of proving fraud "'to the hilt' with clear and convincing evidence, and

24   'any doubt must be resolved against the charging party.'" *Anhing Corp.*, 215 F. Supp. 3d

25   at 934 (quoting *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009)).

26           With respect to ten of the eleven challenged registrations, CCA claims that BBK

27   made false representations in its "use in commerce" declaration submitted with the

28   trademark application. (Doc. 169 at 38–39.) In essence, CCA argues that because many

of BBK's goods are in fact "drug paraphernalia" under § 863 of the CSA, BBK knowingly and intentionally made false statements when indicating in its use in commerce declarations that it was a tobacco company whose products were intended for use with tobacco and were, therefore, in lawful use in commerce. (Doc. 364 at 25–26.)

The undisputed evidence demonstrates that BBK's products have legal uses, and that BBK's representations indicating the marks were used with products "in [lawful] commerce" was (and remains) true. The fact that BBK's products are also used for unlawful purposes does not render its use-in-commerce statement false. Trademark registrants, moreover, are not statutorily required to identify all existing or potential unlawful uses of products that also have legitimate and lawful uses. *See Bart Schwartz Int'l Textiles, Ltd. v. FTC*, 289 F.2d 665, 669 (C.C.P.A. 1961) ("Any 'duty' owed by an applicant for trademark registration must arise out of the statutory requirements of the Lanham Act."). And courts have generally declined to read affirmative disclosure requirements into the Lanham Act. *See, e.g.*, *Veliz v. Veliz*, No. 6:19-cv-00094, 2021 WL 4538489, at *5 (S.D. Tex. Aug. 12, 2021) ("A trademark applicant does not have an 'affirmative duty to disclose all other uses of the mark.' In fact, 'a senior user of a mark is entitled to claim exclusive rights and seek a federal registration even though there may exist and it knows of a junior user of the mark.'" (quoting *San Juan Prods, Inc. v. San Juan Pools of Kan., Inc.*, 849 F.2d 468, 474 (10th Cir. 1988); *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1538 (S.D. Tex. 1996)); *Anhing Corp.*, 215 F. Supp. 3d at 936 (finding trademark applicant had no affirmative duty to disclose geographic reference implied by mark when asked only for a translation). Thus, while misleading omissions can of course form the basis of a fraud claim, *see P. Lorillard Co. v. FTC*, 186 F.2d 52, 58 (4th Cir. 1950) ("To tell less than the whole truth is a well known method of deception; and he who deceives by resorting to such method cannot excuse the deception by relying upon the truthfulness per se of the partial truth by which it has been accomplished."), BBK's omissions in this instance do not. Summary judgment will therefore be granted on CCA's fraud counterclaim with regard to the registrations

challenged based on statements made by BBK in its "use in commerce" declarations.

With respect to the final registration at issue, Registration 5,046,495, CCA claims that BBK made false representations in a declaration submitted in response to a request from the PTO directing BBK to address whether the services identified in the application complied with the CSA. (Doc. 169 at 55.) In particular, CCA asserts that the following paragraph contains false statements:

> BBK . . . is a large company that has manufactured tobacco rolling papers, tubes and other related tobacco accessories for nearly 20 years. Because of inquiries, BBK determined it should present consumer information about the status of medical marijuana on its website, although it has not done so yet. This information will include the current legal status in various jurisdictions as well any potential changes in federal law. The website will contain links to information in support and opposition of medical marijuana as well as references to medical journals and studies. The website will also provide customers an opportunity to comment. The services described do not involve in any way the sale, provision, and/or possession of marijuana, marijuana-based preparations, or marijuana extracts or derivatives, synthetic marijuana, or any other illegal controlled substances. All the services described above comply fully with the Controlled Substances Act.

(Doc. 169 at 55.) Again, the undisputed evidence shows these statements were (and are) true. At the time the statement was made, BBK had manufactured tobacco rolling papers, tubes, and other accessories for almost two decades. And the services provided by its website did not involve the sale, provision, or possession of marijuana. Indeed, CCA does not argue otherwise, let alone introduce admissible evidence to support its position. Again, BBK had no affirmative duty to disclose more than was requested by the PTO. *See Anhing Corp.*, 215 F. Supp. 3d at 936. Thus, CCA has failed to discharge its heavy burden of proving fraud "'to the hilt' with clear and convincing evidence." *In re Bose Corp.*, 580 F.3d at 1243. BBK will be granted summary judgment on CCA's first counterclaim.[30]

### ii. Cancellation for Unlawful Use

To register a trademark, an applicant must show that the mark "is in use in

---

[30] This conclusion is entirely consistent with the Court's earlier order denying BBK's motion to dismiss (Doc. 151), which held only that additional factual development was necessary in order to adequately assess BBK's arguments.

- 52 -

commerce" or that the applicant has a "bona fide intention to use the mark in commerce" in the future. 15 U.S.C. §§ 1051(a)(3)(C), (b)(3)(B). "It has long been the policy of the [PTO]'s Trademark Trial and Appeal Board that use in commerce only creates trademark rights when the use is *lawful*." *CreAgri, Inc. v. USANA Health Scis., Inc.*, 474 F.3d 626, 630 (9th Cir. 2007).[31] Controlled substances and drug paraphernalia, therefore, are not entitled to trademark protection. Drug paraphernalia is defined in the CSA as any "equipment, product, or material of any kind which is primarily intended or designed for use" in conjunction with a controlled substance. 21 U.S.C. § 863(d). The CSA outlines several factors to be considered in determining whether an item constitutes drug paraphernalia, including "instructions, oral or written, provided with the item concerning its use," "national and local advertising concerning its use," "the manner in which the item is displayed for sale," and "expert testimony concerning its use." *Id.* § 863(e). The CSA, however, blanketly exempts from the definition of drug paraphernalia "any item that, in the normal lawful course of business, is . . . traditionally intended for use with tobacco products, including any pipe, paper, or accessory." *Id.* § 863(f)(2). This is commonly called the "tobacco exemption."

In deciding whether an item is "traditionally intended for use with tobacco products," and thus falls within the exemption, courts must employ an objective approach, because "[a]n item's 'traditional' use is not based on the subjective intent of a particular defendant." *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 520–21 (1994). This means that even when a company *intends* for its products to be used in connection with illicit drugs—and advertises its products in accordance with that intention—such products are yet exempt from the CSA if they were "traditionally intended for use with tobacco products." As Justice Scalia explained in his concurrence in *Posters*:

> Unless unlawful intent could have produced liability, there would have been no *need* for the exception. Tobacco pipes are

---

[31] This lawful use requirement applies to a claim for cancellation of a registered mark. *See GoClear LLC v. Target Corp.*, No. C 08-2134 MMC, 2009 WL 160624, at *3 (N.D. Cal. Jan. 22, 2009).

tobacco pipes, and cigarette paper is cigarette paper; neither could possibly meet the Court's test of being "items . . . likely to be used with illegal drugs." Only the criminalizing effect of an unlawful *intent* to sell for drug use puts tobacconists at risk. Because of the ready (though not ordinary) use of items such as cigarette paper and tobacco pipes for drug purposes, tobacconists would have been in constant danger of being accused of having an unlawful intent in their sales—so Congress gave them what amounts to a career exception.

*Id.* at 529 (Scalia, J., concurring) (citations omitted); *see also Lifted Ltd.*, 2021 WL 4480566, at *3 ("[T]he tobacco exemption removes from Section 863's purview any item that is 'traditionally intended' for use with tobacco, regardless of any of the other factors in the statute. Section 863(f)(2) states that '[t]his section *shall not apply*' to products traditionally intended for use with tobacco." (alteration and emphasis in original)).

Accordingly, the Court concludes that, as a matter of law, the goods listed in connection with the challenged registrations fall within the tobacco exemption, § 863(f)(2), because such goods are either rolling papers expressly exempted, or accessories used in connection with rolling papers, such as rolling trays, cigarette tubes, rolling machines, and shredders and grinders for tobacco and other smokeable herbs.[32] (Doc. 169 at 28–30.) While the evidence unmistakably shows that BBK advertises such products for use with cannabis (*see, e.g.*, Doc. 364-3; Doc. 364-22),[33] that evidence is simply irrelevant for purposes of the exemption. *Lifted Ltd.*, 2021 WL 4480566, at *3 ("Since a lighter holder, a tamper, and a poker are all products traditionally intended for

---

[32] Many of the goods listed in the challenged registrations, including cigarette rolling papers, cigarette papers, cigarette filters, cigarette tubes, cigarette-rolling machines, and smokers' rolling trays, appear in the PTO's Acceptable Identification of Goods Manual in Class 34. *See* https://idm-tmng.uspto.gov/id-master-list-public.html (last visited July 7, 2022). This evidence, though alone non-dispositive, suggests that such products are traditionally intended for use with tobacco, since Class 34 includes mainly tobacco and articles used for smoking tobacco.

[33] CCA moves for leave to file a DVD exhibit in support of its counterclaims and in opposition to BBK's motion for partial summary judgment. (Doc. 368.) The motion will be denied. First, the evidence is irrelevant because BBK's subjective intent has no bearing on CCA's counterclaims and because the shredder featured in the video is not one of the goods identified in the challenged registrations. (Doc. 373.) Second, CCA has not demonstrated the need for the Court to view video footage rather than still photographs and a certified transcript.

1    tobacco use, regardless of any other uses they might have, plaintiff's marketing does not

2    change a traditional use to a non-traditional one.").

3            Further, CCA has no evidence suggesting the challenged products are not

4    traditionally intended for use with tobacco.[34] As BBK notes, even Chief Tiderington,

5    whose opinion was excluded, *see supra* Subsection III.A.8, frankly acknowledged that

6    he does not consider himself an expert on tobacco products, much less an expert on

7    whether certain products have traditionally been used with tobacco.[35] (Doc. 293 at 27–28;

8    Doc. 293-24 at 4.) Thus, even assuming BBK has the burden of proving the tobacco

9    exemption applies, *see* 21 U.S.C. § 885(a)(1) ("[T]he burden of going forward with the

10   evidence with respect to any such exemption or exception shall be upon the

11   person claiming its benefit."), CCA has no admissible evidence to controvert BBK's

12   evidence. In short, the record evidence does not give rise to a genuine dispute of fact

13   regarding the applicability of the tobacco exemption. *See S. Cal. Gas Co.*, 336 F.3d at

14   888; Wright & Miller § 2727.1. The Court will therefore grant BBK summary judgment

15   on CCA's unlawful use counterclaim.

16   **IV.    CONCLUSION**

17           Accordingly,

18           **IT IS ORDERED granting** CCA's Motion for Partial Summary Judgment

19   (Docs. 203, 218).

20           **IT IS FURTHER ORDERED granting in part and denying in part as moot**

21   BBK's Motion for Partial Summary Judgment (Docs. 293, 418), as described herein.

22           **IT IS FURTHER ORDERED denying as moot** BBK's Motion to Exclude or

23

24   [34] While CCA asserts that BBK's RAW Black Organic Hemp rolling papers are obviously
     not intended for use with tobacco, because their packaging includes the disclaimer "Not
25   For Use With Tobacco," its argument is unavailing, because CCA does not seek to cancel
     the trademark registration—Registration 6,469,902—for such papers. (Doc. 442 at 9–10.)
26   CCA's evidence and arguments regarding RAW cones are likewise inapposite, because
     BBK does not have a registered trademark for cones. *Republic Techs. (NA), LLC v. BBK*
27   *Tobacco & Foods, LLC*, 262 F. Supp. 3d 605, 608 (N.D. Ill. 2017).
     [35] Chief Tiderington's opinions primarily address whether BBK's products constitute "drug
28   paraphernalia" under the factors listed in § 863(e). As mentioned above, however, "these
     factors are irrelevant if one of two exceptions apply." *Lifted Ltd.*, 2021 WL 4480566, at
     *2.

Limit the Opinions of Dr. Blackburn (Docs. 298, 420).

**IT IS FURTHER ORDERED denying** BBK's Motion to Exclude Opinions and Testimony of Dr. Tülim Erdem (Docs. 302, 421).

**IT IS FURTHER ORDERED denying** BBK's Motion to Exclude or Limit the Opinions of Dr. Elisabeth Honka (Doc. 304).

**IT IS FURTHER ORDERED granting** BBK's Motion to Exclude or Limit the Opinions of Khurshid Kohja (Doc. 305).

**IT IS FURTHER ORDERED granting** BBK's Motion to Exclude Testimony and Opinions of Thomas Tiderington (Doc. 306).

**IT IS FURTHER ORDERED granting** CCA's Motion to Exclude the Testimony of Lance Ott (Doc. 307).

**IT IS FURTHER ORDERED granting in part and denying in part** CCA's Motion to Exclude the Testimony of Ian Kobe (Doc. 308), as described herein.

**IT IS FURTHER ORDERED denying** CCA's Motion to Exclude the Testimony of Dr. On Amir (Docs. 310, 433).

**IT IS FURTHER ORDERED denying as moot** CCA's Motion to Exclude the Testimony of Francis Burns (Docs. 311, 312).

**IT IS FURTHER ORDERED denying** CCA's Motion to Exclude the Testimony of Dr. Jeffrey Stec (Doc. 314).

**IT IS FURTHER ORDERED denying** CCA's Motion to Exclude the Testimony of Louis Maiellano (Doc. 317).

**IT IS FURTHER ORDERED denying** CCA's Motion for Leave to File DVD Copies of Exhibit 29 to CCA's Opposition to BBK's Motion for Partial Summary Judgment (Doc. 368).

**IT IS FURTHER ORDERED denying** BBK's Motion to Further Supplement the Record (Doc. 400).

**IT IS FURTHER ORDERED denying as moot** BBK's Motion to Bifurcate Trial (Doc. 406).

1    **IT IS FURTHER ORDERED** directing the Clerk of the Court to enter judgment

2    in favor of Defendant CCA on Counts I–V and Count VII of the Amended Complaint

3    (Doc. 60 ¶¶ 181–223, 229–30);[36] to enter judgment in favor of Plaintiff BBK on Count

4    VI of the Amended Complaint (Doc. 60 ¶¶ 224–28); to enter judgment in favor of

5    Counterdefendant BBK on Counterclaims I and II (Doc. 169 at 57–59); and to close the

6    case. This Order resolves and directs entry of judgment regarding all claims and all

7    counterclaims asserted by all parties.

8        **IT IS FINALLY ORDERED** that CCA's trademark applications, serial numbers

9    87/324,212, 88/266,152, 88/328,474, and 88/488,733, are invalid and void for a lack of

10   bona fide intent to use the mark in commerce.

11       Dated this 19th day of July, 2022.

12

13

14                                          Michael T. Liburdi

15                                          Michael T. Liburdi
                                            United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28   _____
     [36] Judgment in CCA's favor on Count VII on the Amended Complaint is warranted based
     on the Court's Order (Doc. 151) granting CCA's motion to dismiss.